**ASSET PURCHASE AGREEMENT**

**BY AND BETWEEN**

**RJS HOLDINGS, LLC, BUYER**

**AND**

**NAVARRO PECAN COMPANY, INC., SELLER**

{00010125:2}

# TABLE OF CONTENTS

ARTICLE I.      DEFINITIONS.................................................................................1

    Section 1.1.    Defined Terms ..........................................................................1
    Section 1.2.    Other Definitional Provisions ....................................................7

ARTICLE II.     Transfer of assets and assumption of liabilities ...............................8

    Section 2.1.    Transfer of Subject Assets .........................................................8
    Section 2.2.    Assumption of Liabilities............................................................9
    Section 2.3.    Subject Assets Sold "As Is, Where Is" ......................................9
    Section 2.4.    Excluded Assets .......................................................................10
    Section 2.5.    Method of Conveyance and Transfer........................................11
    Section 2.6.    Delivery of Instruments of Transfer .........................................11
    Section 2.7.    Further Assurances....................................................................11

ARTICLE III.    PAYMENT OF PURCHASE PRICE .................................................11

    Section 3.1.    Purchase Price ..........................................................................11
    Section 3.2.    Tax Allocation of Purchase Price .............................................12
    Section 3.3.    Transfer Taxes .........................................................................12

ARTICLE IV.    REPRESENTATIONS, WARRANTIES AND AGREEMENTS OF SELLER
..............................................................................................................................12

    Section 4.1.    Organization and Good Standing...............................................12
    Section 4.2.    Authority ..................................................................................13
    Section 4.3.    No Violation or Consents...........................................................13
    Section 4.4.    Compliance with Law ...............................................................13
    Section 4.5.    Litigation..................................................................................13
    Section 4.6.    Financial Statements and Reports; Material Liabilities .................13
    Section 4.7.    Absence of Certain Events........................................................14
    Section 4.8.    Material Contracts .....................................................................14
    Section 4.9.    Employee Benefit Plans ............................................................15
    Section 4.10.   Intellectual Property...................................................................15
    Section 4.11.   Environmental...........................................................................15
    Section 4.12.   Real Property ...........................................................................16
    Section 4.13.   Seller as Debtor in Possession; No Trustee ...............................17
    Section 4.14.   Assigned Executory Contracts ..................................................17
    Section 4.15.   Notice .......................................................................................17

ARTICLE V.     REPRESENTATIONS AND WARRANTIES OF BUYER .........................17

    Section 5.1.    Organization and Good Standing..................................................17
    Section 5.2.    Authority ..................................................................................17
    Section 5.3.    No Violation of Charter Documents, Contracts or Laws................18
    Section 5.4.    Subject Assets "As Is"/Release........................................................18

Section 5.5.       Available Funds ...................................................................................18

ARTICLE VI.       ADDITIONAL COVENANTS OF THE PARTIES .....................................18

Section 6.1.       Due Diligence; Access to Information.................................................18
Section 6.2.       Mutual Cooperation ...........................................................................18
Section 6.3.       Seller's Employees..............................................................................19
Section 6.4.       Name Change.......................................................................................19
Section 6.5.       Further Assurances..............................................................................19
Section 6.6.       Governmental Approvals ....................................................................19
Section 6.7.       Publicity ..............................................................................................20
Section 6.8.       Casualty................................................................................................20
Section 6.9.       Conduct of Business ...........................................................................20

ARTICLE VII.      BANKRUPTCY PROCEDURES, ETC .......................................................20

Section 7.1.       Motion to Sell and Notice ..................................................................20
Section 7.2.       Defense of Orders ...............................................................................20
Section 7.3.       Assumption and Rejection of Contracts and Leases and Cure Procedure ......21

ARTICLE VIII.     CONDITIONS PRECEDENT TO OBLIGATIONS OF BUYER .................21

Section 8.1.       Representations and Warranties..........................................................21
Section 8.2.       Performance of Covenants .................................................................21
Section 8.3.       No Injunctions.....................................................................................22
Section 8.4.       No Violation of Law ...........................................................................22
Section 8.5.       No Material Adverse Effect ................................................................22
Section 8.6.       Assigned Executory Contracts ...........................................................22
Section 8.7.       Instruments of Transfer; Third-party Consents...................................22
Section 8.8.       Required Regulatory Approvals ..........................................................22
Section 8.9.       Absence of Certain Changes ...............................................................22
Section 8.10.      Certificate of Non-Foreign Status ......................................................22
Section 8.11.      No Defaults under Orders ...................................................................22
Section 8.12.      Sale Order ...........................................................................................22

ARTICLE IX.       CONDITIONS PRECEDENT TO SELLER'S OBLIGATIONS...................23

Section 9.1.       Representations and Warranties..........................................................23
Section 9.2.       Performance of Covenants .................................................................23
Section 9.3.       No Injunctions.....................................................................................23
Section 9.4.       No Violation of Law ...........................................................................23
Section 9.5.       Cure Procedure, Procedure for Designation of Assigned Executory Contracts
                   and Satisfaction of Cure Obligations .................................................23
Section 9.6.       Sale Order ...........................................................................................23
Section 9.7.       No Material Adverse Effect ................................................................23

ARTICLE X.        CLOSING .................................................................................................24

Section 10.1.    Closing ...........................................................................................24

ARTICLE XI.    TERMINATION; SURVIVAL AND LIMITATIONS OF
REPRESENTATIONS AND WARRANTIES...............................................24

Section 11.1.    Termination.....................................................................................24
Section 11.2.    Effect of Termination.......................................................................25
Section 11.3.    Termination of Representations and Warranties................................25
Section 11.4.    Termination of Covenants.................................................................25
Section 11.5.    Limitations of Representations and Warranties .................................25

ARTICLE XII.    OTHER AGREEMENTS .....................................................................26

Section 12.1.    Other Agreements ...........................................................................26

ARTICLE XIII.    EXPENSES .......................................................................................26

Section 13.1.    Expenses .........................................................................................26

ARTICLE XIV.    NOTICES ..........................................................................................26

Section 14.1.    Notices ............................................................................................26

ARTICLE XV.    REMEDIES NOT EXCLUSIVE ..........................................................27

ARTICLE XVI.    MISCELLANEOUS ...........................................................................28

Section 16.1.    Counterparts ...................................................................................28
Section 16.2.    Captions and Section Headings .......................................................28
Section 16.3.    Singular and Plural .........................................................................28
Section 16.4.    Passage of Title and Risk of Loss ....................................................28
Section 16.5.    Waivers ...........................................................................................28
Section 16.6.    Parties in Interest............................................................................28
Section 16.7.    Benefit and Burden; Assignment ......................................................28
Section 16.8.    Amendments, Supplements or Modifications....................................29
Section 16.9.    Entire Agreement ............................................................................29
Section 16.10.    Governing Laws..............................................................................29
Section 16.11.    Venue and Jurisdiction....................................................................29
Section 16.12.    Construction ...................................................................................29
Section 16.13.    Validity of Provisions ......................................................................29
Section 16.14.    Access to Records and Records Retention........................................29
Section 16.15.    Notice to Customers........................................................................30

[Signatures follow on the next page.] ......................................................................30

## ASSET PURCHASE AGREEMENT

This Asset Purchase Agreement (the "***Agreement***") is made and entered into as of the [Day] day of January, 2023 (the "***Execution Date***"), by and between RJS Holdings, LLC ("***Buyer***"), a Texas limited liability company, and Navarro Pecan Company, Inc., a Texas corporation ("***Seller***"). Seller and Buyer may be referred to herein individually as a "***Party***" or collectively, as the "***Parties***."

## BACKGROUND

A.     Seller is engaged in the business of pecan shelling, marketing, packaging, and distribution (collectively, the "***Business***"). On January [**], 2023 (the "***Petition Date***"), Seller filed a voluntary petition for relief under chapter 11 of the Bankruptcy Code in the Northern District of Texas, Case No. 23-40266 (the "***Case***") thus creating the bankruptcy estate.

B.     Buyer desires to purchase the Subject Assets (as defined below) pursuant to the applicable sections of the Bankruptcy Code and to assume the Assumed Liabilities (as defined below) from the Seller, on the following terms and conditions.

C.     Seller desires to sell the Subject Assets and to assign the Assumed Liabilities to Buyer on the following terms and conditions.

NOW, THEREFORE, in consideration of the premises and the mutual promises herein made, and in consideration of the representations, warranties, and covenants herein contained, the Parties agree as follows:

## ARTICLE I.

## DEFINITIONS

Section 1.1.     **Defined Terms.** As used herein, the terms below shall have the following ascribed meanings:

(a)     "***Accounts Receivable***" means all of the accounts, instruments, drafts, acceptances, trade, note and other forms of receivables and all rights earned under contracts to sell goods or render services, including all rights in and to monies due for shelling, packaging, roasting, sell pecans from owners of vehicles or others for the transportation of vehicles plus any associated fees and costs, and any checks, drafts, instruments or other documents representing or constituting the same.

(b)     "***Affiliate***" has the meaning set forth in Bankruptcy Code Section 101.

(c)     "***Agreement***" means this Agreement (together with all schedules and exhibits referenced herein).

(d)     "***Assigned Executory Contracts***" means all executory contracts and unexpired leases, including, but not limited to, personal property leases, real property leases, service agreements, supplier agreements, distribution agreements and operating agreements set forth on

Schedule 4.8 that relate to the Subject Assets. Schedule 4.8, the list of Assigned Executory Contracts, may be amended in accordance with Section 7.3 up until Closing.

(e)    "***Assumed Liabilities***" means only those obligations arising after the Closing Date under the Assigned Executory Contracts (except for any obligations or liabilities arising after the Closing Date attributable to any failure by Seller to fully comply with the terms of the Assigned Executory Contracts prior to the Closing Date).

(f)    "***Bankruptcy Code***" means the United States Bankruptcy Code, 11 U.S.C. Section 101, et seq., as amended, or any successor thereto, and any rules and regulations promulgated thereunder.

(g)    "***Bankruptcy Rules***" means the Federal Rules of Bankruptcy Procedure, as amended, or any successor rules.

(h)    "***Bill of Sale and Assignment***" has the meaning set forth in Section 2.6, in the form attached to this Agreement as Exhibit A.

(i)    "***Books and Records***" has the meaning set forth in Section 2.1(m).

(j)    "***Breach***" means any breach of, or any inaccuracy in, any representation or warranty or any breach of, or failure to perform or comply with, any covenant or obligation in or of this Agreement or any other Contract, or any event which with the passing of time or the giving of notice, or both, would constitute such a breach, inaccuracy or failure.

(k)    "***Business***" has the meaning set forth in the Recitals to this Agreement.

(l)    "***Business Day***" means any day that is not a Saturday, Sunday, legal holiday or a day on which banks are closed as required by applicable Law.

(m)    "***Buyer***" has the meaning set forth in the first paragraph of this Agreement.

(n)    "***Case***" has the meaning set forth in the Recitals.

(o)    "***Cash and Cash Equivalents***" means cash, third-party checks, wire transfers and any other funds of Seller, and commercial paper, marketable securities, certificates of deposit and other bank deposits, treasury bills and other cash equivalents of Seller calculated in accordance with GAAP.

(p)    "***Claim***" or "***Claims***" has the meaning set forth in Section 2.4(b).

(q)    "***Closing***" or "***Close***" has the meaning set forth in Section 10.1.

(r)    "***Closing Date***" has the meaning set forth Section 10.1.

(s)    "***Code***" means the Internal Revenue Code.

(t)    "***Confidential Information***" means all information in any form or medium that relates to Seller, the Business, the Subject Assets or the Assumed Liabilities, including financial

information, projections, pricing structures, technical data, trade secrets, know-how, ideas, inventions, designs, research, development plans, identities of and arrangements with customers and suppliers, software and data bases, but shall not include any information that (i) is generally available to, or known by, the public (other than as a result of disclosure in violation of this Agreement), (ii) is already in the recipient's possession or comes into recipient's possession on a non-confidential basis (other than as a result of disclosure in violation of this Agreement), or (iii) is independently developed by the receiving party without reliance in any way on any Confidential Information.

(u)    **"*Copyrights*"** has the meaning set forth in the definition of the term Intellectual Property.

(v)    **"*Court*"** means the United States Bankruptcy Court for the Northern District of Texas.

(w)    **"*DIP Funding*"** means that certain funding, aggregating $5,180,926.00 (which amount includes the DIP Inventory Funding), provided by Buyer to Seller pursuant to the DIP Order permitting Buyer to extend credit to Seller, subject Buyer being afforded certain protections as a debtor in possession lender, as described in the DIP Order, and specifically including a lien on the Real Property.

(x)    **"*DIP Inventory Funding*"** means that certain funding, aggregating $1,805,926.00, provided by Buyer to Seller to purchase inventory pursuant to the DIP Order permitting Buyer to extend credit to Seller, subject Buyer being afforded certain protections as a debtor in possession lender, as described in the DIP Order, and specifically including a lien on the Inventory, Accounts Receivable, and Cash and Cash Equivalents generated therefrom.

(y)    **"*DIP Order*"** means that certain interim/final order entered by the Bankruptcy Court.

(z)    **"*Employee Benefit Plan*"** means (x) any "employee benefit plan" or "plan" within the meaning of Section 3(3) of the Employee Retirement Income Security Act ("***ERISA***"), and (y) all plans or policies providing for "fringe benefits" (including but not limited to vacation, paid holidays, personal leave, employee discounts, educational benefits or similar programs), and each other bonus, incentive compensation, deferred compensation, profit sharing, stock, severance, retirement, health, life, disability, group insurance, employment, stock option, stock purchase, stock appreciation right, performance share, supplemental unemployment, layoff, consulting, or any other similar plan, agreement, policy or understanding (whether qualified or nonqualified, currently effective or terminated within the six (6) years preceding the date hereof), and any trust, escrow or other agreement related thereto, which (i) is or has been established, maintained or contributed to by Seller or any other corporation or trade or business under common control with Seller (an "***ERISA Affiliate***") as determined under Section 414(b), (c) or (m) of the Code with respect to the Business, or with respect to which Seller has or may have any Liability that could affect the Business, or (ii) provides benefits, or describes policies or procedures applicable, to any director, officer, employee, former director, officer, employee or dependent thereof of Seller, regardless of whether funded. Employee Benefit Plan also includes any written or enforceable oral representations made to any director, officer, employee or former director, officer or employee of Seller promising or guaranteeing any employer payment or funding for the continuation of

medical, dental, life or disability coverage for any period of time beyond the end of the current plan year (except to the extent of coverage required under Code Section 4980B or complementary state law).

(aa)     "*Encumbrance*" means any charge, claim, community property interest, condition, equitable interest, Lien, option, pledge, security interest, mortgage, right-of-way, easement, encroachment, servitude, right of first option, right of first refusal or similar restriction, including any restriction on use, voting (in the case of any security or equity interest), transfer, receipt of income, exercise of any other attribute of ownership, or other similar encumbrances of any nature whatsoever.

(bb)     "*Excluded Assets*" has the meaning set forth in Section 2.4.

(cc)     "*Excluded Liabilities*" means each and every Liability of the Seller (whether arising prior to, at the time of, or subsequent to Closing) other than the Assumed Liabilities.

(dd)     "*Executory Contracts*" means all contracts and unexpired leases to which Seller is a party, and under which each party thereto continues to have unperformed obligations, including, but not limited to, the obligation of any party to make payment or perform services. The definition of "*Executory Contracts*" includes, but is not limited to, personal property leases, real property leases, supplier agreements, distribution agreements, operating agreements, and executory licenses of Intellectual Property.

(ee)     "*Final Order*" means an order or judgment, the operation or effect of which is not stayed, as to which order or judgment (or any revision, modification or amendment thereof), the time to appeal or seek review or rehearing has expired, and as to which no appeal or petition for review or motion for re-argument has been taken or been made and is pending for argument.

(ff)     "*Financial Statements*" has the meaning set forth in Section 4.6 of this Agreement.

(gg)     "*GAAP*" means United States generally accepted accounting principles.

(hh)     "*General Warranty Deed*" means Exhibit C attached hereto.

(ii)     "*Governmental Authority*" means any national, federal, state, local or other governmental, regulatory or administrative authority, agency, department, or any court, tribunal or judicial or arbitral body of any country or any political subdivision thereof.

(jj)     "*Intellectual Property*" means on a world-wide basis, any and all: (i) patents, patent disclosures, patent applications, designs, algorithms and other industrial property rights, (ii) trademarks, service marks, trade names, service names, brand names, all trade dress rights, labels or other trade rights, logos, domain names, corporate names and general intangibles of a like nature, together with the goodwill associated with any of the foregoing, all applications, registrations and renewals thereof, material unregistered trademarks and the ability to apply and/or register any trademark, service mark or trade name used in the Business (collectively, "*Trademarks*"), (iii) copyrights, copyright registrations and applications therefor, works of authorship, and mask work rights and, material unregistered copyrights, in each case used primarily in connection with the purchased Business (collectively, "*Copyrights*"), (iv) mask works, (v) computer software

(including source code (with all programmer notes, comments and remarks, if any), object code, macros, scripts, objects, routines, modules and other components), data, data bases and documentation thereof, (vi) trade secrets and other confidential or proprietary information (including ideas, formulas, recipes, compositions, inventions (whether patentable or unpatentable and whether or not reduced to practice), know-how, products, processes, techniques, methods, research and development information and results, drawings, specifications, designs, technical and development plans and proposals, technical data and customer, prospect and supplier lists and information), (vii) registered user entries, registrations of entries, Internet web sites and content, promotional material and other trade rights, whether or not registered, technology, proprietary and other technical information, including all contracts, agreements and licenses relating thereto, owned by Seller or in which it has any rights ("***Proprietary Property***"), (viii) other intellectual and industrial property rights of every kind and nature and however designated, whether arising by operation of law, contract, license or otherwise, (ix) "data" as defined in 48 CFR Section 27.401, (x) copies and tangible embodiments thereof (in whatever form or medium), and (xi) registrations, applications (pending and in-process), renewals, extensions, continuations, divisions or reissues of or for any of the foregoing rights, now or hereafter in force (including all rights therein).

(kk)      "***Intellectual Property Assignment Agreement***" has the meaning set forth in Section 2.6, a form of which is attached to this Agreement as <u>Exhibit B</u>.

(ll)      "***Inventory***" means, that certain inventory purchased by Seller using the proceeds from the DIP Inventory Funding.

(mm)   "***Law***" means any national, federal, state, local or other law, statute, rule, regulation, ordinance, code, policy, order, decree, judgment, consent, settlement agreement or other governmental requirement enacted, promulgated, entered into, agreed to or imposed by any Governmental Authority.

(nn)      "***Liability***" and "***Liabilities***" means, as to any Person, all direct or indirect debts, adverse claims, liabilities, commitments, responsibilities, and obligations of any kind or nature whatsoever, direct, indirect, absolute or contingent, of such Person, whether accrued, vested or otherwise, whether known or unknown, whether due or to become due, whether asserted or unasserted and whether or not actually reflected, or required to be reflected, in such Person's balance sheets or other books and records.

(oo)      "***Lien***" means any claim, pledge, option, charge, hypothecation, easement, security interest, right-of-way, encroachment, mortgage, and deed of trust or other encumbrance.

(pp)      "***Material***" means any result, action or item which a reasonable Person operating a business of the size and type of Seller would deem sufficient to have a significant impact on such business's operation in the Ordinary Course of Business or on the value of the Subject Assets.

(qq)      "***Material Adverse Effect***" means an event, violation, inaccuracy, circumstance or other matter that (individually or in the aggregate) would adversely affect the business, condition (financial or otherwise), capitalization, assets, liabilities, operations or financial performance of the Subject Assets taken as a whole by more than $100,000.00; provided that the following shall not be deemed to constitute, create or cause a Material Adverse Effect (i) any changes,

circumstances or effects that result from any of the transactions contemplated by this Agreement and public announcement thereof, (ii) a change in GAAP or regulatory accounting principles or interpretations thereof after the date hereof, (iii) any act of war or terrorism (or, in each case, escalation thereof) or declaration of a national emergency, (iv) any natural disaster, except in each case covered by clauses (i) through (iv) to the extent such event, effect, occurrence, development, circumstance or change of fact disproportionately affects Seller as compared to other companies engaged in an industry substantially similar to the Business. Any failure by Seller to meet internal or other financial projections or forecasts for any period shall not, by itself, be deemed a Material Adverse Effect.

(rr)   **"*Material Contracts*"** has the meaning set forth in Section 4.8 of this Agreement.

(ss)   **"*Ordinary Course of Business*"** means, with respect to any Person, such Person has conducted its business in the ordinary and usual course consistent with its past custom and practices (except any payments or liabilities to any related parties of Seller other than rent or salaries) and in accordance with applicable Laws.

(tt)   **"*Parties*"** has the meaning set forth in the first paragraph of this Agreement.

(uu)   **"*Party*"** has the meaning set forth in the first paragraph of this Agreement.

(vv)   **"*Permit*"** means any permit, franchise, certificate, consent, clearance, notification, authorization, approval, registration or license granted by or obtained from any Governmental Authority in accordance with applicable Law.

(ww)   **"*Permitted Liens*"** means (i) statutory Liens for current Taxes, assessments or other governmental charges not yet due and payable or the amount or validity of which is being contested in good faith; (ii) zoning, entitlement and other land use and environmental regulations or designations by any Governmental Entity provided that such regulations or designations have not been violated, which in each case do not materially interfere with the operation of the Business as currently conducted; (iii) title of a lessor under a capital or operating lease arising from and related to any Assumed Liabilities; and (iv) Liens and Encumbrances arising from and related to any Assumed Liabilities.

(xx)   **"*Person*"** means an individual, partnership, joint venture, corporation, business trust, limited liability company, trust, unincorporated organization, joint stock company, labor union, estate, Governmental Entity or other entity.

(yy)   **"*Petition Date*"** has the meaning set forth in the Recitals to this Agreement.

(zz)   **"*Proceeding*"** means any action, suit, charge, complaint, claim or legal, administrative, arbitration or other alternative dispute resolution proceeding or investigation.

(aaa)   **"*Proprietary Property*"** has the meaning set forth in the definition of Intellectual Property.

(bbb)   **"*Purchase Price*"** has the meaning set forth in Section 3.1.

(ccc)    "**_Real Property_**" has the meaning set forth in Section 2.1(l).

(ddd)    "**_Related Agreements_**" means the Bill of Sale and Assignment, the General Warranty Deed, the Intellectual Property Assignment Agreement, and any other written agreement executed on or after the date hereof by Seller, Buyer or any of their respective Affiliates, as applicable, in connection with the transactions provided for in this Agreement and the Closing hereunder.

(eee)    "**_Required Regulatory Approvals_**" means all consents and approvals required from all regulatory authorities or Governmental Authorities having jurisdiction over the Parties as shall be necessary for the completion of the transactions contemplated by this Agreement and the continuation of the Business, by Buyer, post-Closing.

(fff)    "**_Sale Order_**" means an order approving the Motion to Sell which has become a final non-appealable order under the applicable provisions of the Bankruptcy Code and Bankruptcy Rules.

(ggg)    "**_Seller_**" has the meaning set forth in the first paragraph of this Agreement.

(hhh)    "**_Seller's Bankruptcy Filings_**" has the meaning set forth in Section 4.7.

(iii)    "**_Sorter_**" means that certain TOMRA 5C 1200 Sorter with high-capacity EM infeed shaker with hopper, cooling unit, and spare parts package, Serial Number N-F-430281-21-04688.

(jjj)    "**_Subject Assets_**" has the meaning set forth in Section 2.1.

(kkk)    "**_Tax_**" or "**_Taxes_**" means any current, deferred, federal, state, county, local, foreign and other taxes, assessments, duties or charges of any kind whatsoever, including income, profits, gains, net worth, sales and use, _ad valorem,_ gross receipts, business and occupation, license, minimum, alternative minimum, environmental, estimated, stamp, custom duties, occupation, property (real or personal), franchise, capital stock, license, excise, value added, payroll, employees, income withholding, social security, unemployment or other tax, together with any penalty, addition to tax or interest on the foregoing.

(lll)    "**_Tax Return_**" means any return, declaration, report, claim for refund, or information return or statement relating to Taxes, including any schedule or attachment thereto, and including any amendment thereof.

(mmm)"**_Trademarks_**" has the meaning set forth in the definition of Intellectual Property.

Section 1.2.    <u>Other Definitional Provisions</u>.

(a)    The words "hereof," "herein" and "hereunder" and words of similar import when used in this Agreement shall refer to this Agreement as a whole and not to any particular provision of this Agreement, and Section, Schedule and Exhibit references are to this Agreement unless otherwise specified.

(b)     The meanings given to terms defined herein shall be equally applicable to both singular and plural forms of such terms.

(c)     Whenever the words "include," "includes" or "including" are used in this Agreement they shall be deemed to be followed by the words "without limitation."

(d)     Words denoting any gender shall include all genders. Where a word or phrase is defined herein, each of its other grammatical forms shall have a corresponding meaning.

(e)     A reference to any party to this Agreement or any other agreement or document shall include such party's successors and permitted assigns.

(f)     A reference to any legislation or to any provision of any legislation shall include any modification or re-enactment thereof, any legislative provision substituted therefor and all regulations and statutory instruments issued thereunder or pursuant thereto.

(g)     All references to "$," USD and dollars shall be deemed to refer to the currency of the United States of America.

(h)     All references to any financial or accounting terms shall be defined in accordance with GAAP, except as otherwise specifically defined herein.

## ARTICLE II.

### TRANSFER OF ASSETS AND ASSUMPTION OF LIABILITIES

Section 2.1.     Transfer of Subject Assets. On the terms of and subject to the conditions in this Agreement, Seller will sell, convey, transfer, assign and deliver to Buyer and/or its assignee as specified in the General Warranty Deed and the Bill of Sale and Assignment, on the Closing Date, all of Seller's right and title to and interest in all of the operating assets of Seller, except the Excluded Assets (collectively, the **"*Subject Assets*"** including, but not limited to):

(a)     [Reserved];

(b)     All fixed assets, leasehold improvements, vehicles and equipment set forth on Schedule 2.1(b);

(c)     All personal property including product catalogs, advertising materials, stationery, purchase order forms, sale order forms and invoices, backlog, claims and rights under contracts, distribution agreements, supplier agreements, purchase orders, work orders, leases of equipment, machinery, vehicles, production machinery, tooling and office furniture and equipment and other items of personal property set forth on Schedule 2.1(c);

(d)     [reserved];

(e)     All licenses, permits, franchises, certificates, approvals and authorizations necessary to conduct the Business, including but not limited to the property set forth on Schedule 2.1(e);

(f)      All intangible assets and goodwill of Seller;

(g)      All Intellectual Property of any kind used in the Business, including, but not limited to, the property set forth on Schedule 2.1(g), the benefit of third-party representations, warranties and guarantees, supplier lists, customer lists, business plans and strategies, marketing materials and plans, trade secrets, know-how, computer software and programs, telephone numbers and domain names the trademarks and trade names "Navarro Pecan Company, Inc.," and "Navarro", and any derivative or combination of those marks and names and all other taglines or slogans used by Seller in connection with the Business or its products, including all goodwill associated therewith;

(h)      All Accounts Receivable of Seller generated from the Inventory;

(i)      The amount of any and all rights to any insurance proceeds received or entitled to be received by Seller related to any of the Subject Assets, including any real property, regardless of if a claim on the applicable insurance policy was made prior to Closing or after Closing;

(j)      All prepaid expenses, prepaid rents, prepaid insurance, prepaid insurance policies, utility deposits and deposits on contractual obligations related to Subject Assets set forth on Schedule 2.1(j));

(k)      All computer records, files, books and records ("**Books and Records**") of Seller relating to the Business (but excluding Seller's Retained Records), all as the same exist on the Closing Date including but not limited to, accounting information, marketing reports, statements, and customer lists and accounts; and

(l)      The Real Property set forth on Schedule 2.1(l), together with all buildings and improvements located thereon, which will be assigned and transferred pursuant to the General Warranty Deed.

The Subject Assets, whether or not specifically itemized above, that fall under the definition of Assigned Executory Contracts are subject to the terms of Section 7.3, and any Executory Contract that is not specifically designated by Buyer in accordance with the procedures set forth in Section 7.3 shall be an Excluded Asset (as defined below). Subject Assets shall be identified within three (3) days of Closing, but Buyer retains the ability to amend the list of Subject Assets up until the day of Closing.

Section 2.2.      Assumption of Liabilities. In addition to the payment of the Purchase Price, Buyer shall assume the Assumed Liabilities at the Closing. Notwithstanding any provision in this Agreement or any other writing to the contrary, Buyer is assuming only the Assumed Liabilities and is not assuming any Excluded Liabilities or any other Liability of any predecessor of Seller or any prior owner of all or part of its businesses and assets of whatever nature, whether presently in existence or arising hereafter. All such other Liabilities (including the Excluded Liabilities) shall be retained by and remain obligations and liabilities of Seller.

Section 2.3.      Subject Assets Sold "As Is, Where Is". THE PARTIES HERETO AGREE THAT THE SUBJECT ASSETS SOLD PURSUANT TO THIS AGREEMENT ARE SOLD, CONVEYED, TRANSFERRED AND ASSIGNED ON AN "AS IS, WHERE IS" BASIS "WITH

ALL FAULTS" AND THAT EXCEPT AS EXPRESSLY SET FORTH IN ARTICLE IV OF THIS AGREEMENT, SELLER MAKES NO REPRESENTATIONS OR WARRANTIES, TERMS, CONDITIONS, UNDERSTANDINGS OR COLLATERAL AGREEMENTS OF ANY NATURE OR KIND, EXPRESS OR IMPLIED, BY STATUTE OR OTHERWISE, CONCERNING THE SUBJECT ASSETS OR THE CONDITION, QUALITY, OR USEFULNESS, OF THE SUBJECT ASSETS, INCLUDING WITHOUT LIMITATION ANY IMPLIED WARRANTY OF MERCHANTABILITY OR FITNESS FOR A PARTICULAR PURPOSE, WHICH WARRANTIES ARE ALSO HEREBY EXPRESSLY DISCLAIMED. THE PARTIES FURTHER ACKNOWLEDGE AND AGREE THAT NO PARTY SHALL BE LIABLE UNDER THIS AGREEMENT FOR ANY LOST PROFITS OR INDIRECT, CONSEQUENTIAL, PUNITIVE OR SPECIAL DAMAGES UNDER ANY CIRCUMSTANCES.

Buyer confirms, acknowledges and agrees that it has inspected the Subject Assets prior to the execution of this Agreement to the extent that it wishes to do so and that Buyer is relying upon its own investigations and inspections of the Subject Assets with respect to the quality and condition thereof.

Section 2.4.    Excluded Assets. Seller shall retain, and Buyer shall not purchase, Seller's right, title and interest in or to any of the following assets and properties of Seller (collectively, the "***Excluded Assets***"), all of which shall remain the exclusive property of Seller, free and clear of any Claim of Buyer:

(a)    Any Executory Contracts other than the Assigned Executory Contracts listed on Schedule 4.8;

(b)    Any inventory other than the Inventory;

(c)    All rights, demands, claims, actions and causes of action (collectively, "***Claims***") which Seller may have (x) against any Affiliate of Seller in respect of intercompany receivables, guarantees or indemnities by Seller, or (y) against any Person (other than Buyer and its Affiliates) solely with respect to any Excluded Assets, other than Accounts Receivable with respect to Excluded Assets (the "***Excluded Claims***");

(d)    All Claims that Seller may have against any third-party, including any Governmental Entity, under Chapter 5 of the Bankruptcy Code or otherwise constituting Cause of Action (as defined in the Plan) (collectively, the "***Avoidance Actions***");

(e)    Loans owed to Seller by any employee or director of Seller and any intercompany loans;

(f)    All rights of Seller under this Agreement, and the agreements and instruments delivered to Seller by Buyer pursuant to this Agreement or the transactions contemplated hereby;

(g)    The company seal, minute books, charter documents, stock or equity record books and such other books and records as pertain to the organization, existence or capitalization of Seller;

(h)    Any information that constitutes personally identifiable information as defined by Bankruptcy Code Section 101(41A).

(i)    Seller's directors' and officers' liability insurance policy, executive or incentive compensation, bonus, deferred compensation, pension, profit sharing, savings, retirement, stock option, stock purchase, group life, health or accident insurance or other Employer Benefit Plan;

(j)    All membership interests, capital stock or other equity interests of Seller, including any options, warrants or other securities exchangeable or convertible into membership interest, capital stock or other equity interests of Seller; and

Section 2.5.    Method of Conveyance and Transfer. At Closing and subject to the Sale Order, Seller shall transfer good and marketable title to the Subject Assets to Buyer free and clear of any and all Encumbrances other than the Assumed Liabilities.

Section 2.6.    Delivery of Instruments of Transfer. At Closing, Seller shall deliver to Buyer or its assignee such specific assignments, bills of sale, endorsements, certificates, leases, deeds, real property title documents and other good and sufficient instruments of conveyance and transfer, in form and substance satisfactory to Buyer and its counsel, as shall be reasonably requested by Buyer to effectively vest in Buyer or its assignee, as provided in the Sale Order issued pursuant to the Bankruptcy Code, good and marketable title to all the Subject Assets, including, dated the Closing Date the Bill of Sale and Assignment in the form attached hereto as Exhibit A, the Intellectual Property Assignment Agreement in the form attached hereto as Exhibit B, and the General Warranty Deed in the form attached hereto as Exhibit C. Simultaneously with the delivery of such instruments and agreements, Seller shall place Buyer or its assignee in actual possession and operating control of the Subject Assets and, if required, as the case may be with respect to the domain names identified in Section 2.1(g) have the appropriate Person from Seller available to cause the transfer of those domain names as may be required by the Registrars of the domain names. In addition to the foregoing, at the Closing, Seller shall also deliver all of the documents and agreements and other deliveries contemplated by Article VIII.

Section 2.7.    Further Assurances. Seller, at any time and from time to time after the Closing, upon reasonable request of Buyer, will do, execute, acknowledge and deliver all such further acts, deeds, assignments, transfers, conveyances, powers of attorney and assurances as may be reasonably required for the better conveying, transferring, assigning and delivering to Buyer, or to its successors and assigns, and for aiding and assisting in collecting and reducing to Buyer's possession, all of the Subject Assets.

## ARTICLE III.

## PAYMENT OF PURCHASE PRICE

Section 3.1.    Purchase Price.

(a)    The purchase price for the Subject Assets will be $11,349,924.00 USD (the "**Purchase Price**"). The Purchase Price allocation is set forth in Exhibit D.

(b)    The cash consideration to be paid by Buyer at Closing shall be:

     i.       the Purchase Price, less

     ii.      the DIP Funding, which, for the avoidance of doubt, Buyer is credit-bidding, less

     iii.     any payments actually received by Seller from the sale of Inventory prior to Closing.

Section 3.2.    <u>Tax Allocation of Purchase Price</u>. The Buyer and Seller shall work together to agree on the allocation of the Purchase Price among the Subject Assets in accordance with Code Section 1060 and applicable Treasury Regulations (and similar provisions of state or local law). To the extent that Buyer and Seller agree on the allocation of the Purchase Price Buyer and Seller shall file, in accordance with Section 1060 of the Code an Asset Allocation Statement on Form 8594 which reflects the agreed upon allocations for the Subject Assets with its federal income tax return for the tax year in which the Closing Date occurs and shall contemporaneously provide the other Party with a copy of the Form 8594 being filed. Each Party agrees not to assert, in connection with any tax return, audit or other similar proceeding, any allocation of the aggregate consideration which differs from the agreed to allocation. Notwithstanding any other provisions of this Agreement, this Section 3.3 shall survive the Closing Date without limitation, and shall not be an admission of and shall not be evidence of the value of any of the Subject Assets on Seller's Case or any other related proceeding, and shall be for tax purposes only. To the extent that Buyer and Seller are unable to agree on the allocation of the Purchase Price for each Seller, then Buyer and each Seller shall be free to file a Form 8594 completed by such party.

Section 3.3.    <u>Transfer Taxes</u>. All applicable sales and transfer taxes ("***Transfer Taxes***"), if any, arising by reason of the transfer of the Subject Assets under this Agreement will be paid by Buyer.

# ARTICLE IV.

## REPRESENTATIONS, WARRANTIES AND AGREEMENTS OF SELLER

Section 4.1.    <u>Organization and Good Standing</u>.

(a)    Seller is a company duly organized, validly existing and in good standing under the laws of the State of Texas. Seller has full power and authority to carry on the Business as and where now conducted and to own or lease and operate their respective properties as and where now owned or leased and operated by them, and are duly qualified to do business in every jurisdiction in which the property owned, leased or operated by them, or the nature of the business conducted by them, makes such qualification necessary.

(b)    Set forth on Schedule 4.1(b) is a true and correct list of all jurisdictions where Seller has material business operations or owns or leases property.

(c)    Set forth on Schedule 4.1(c) is a true and correct organization chart indicating Seller and its respective corporate parents or individual owners and subsidiaries as of the date of this Agreement and as of the Closing.

Section 4.2.    Authority. Subject to the entry of the Sale Order, (a) Seller has all requisite power and authority, corporate, trustee, partnership or otherwise, to execute, deliver and perform under this Agreement and the other agreements, certificates, and instruments to be executed by it in connection with or pursuant to this Agreement (together with this Agreement, the "***Seller's Documents***"); (b) the execution, delivery, and performance by Seller of each Seller Document to which it is a party has been duly authorized by all necessary action, corporate or otherwise, on the part of **such** Seller; (c) this Agreement has been, and at the Closing the other Seller's Documents will be, duly executed and delivered by Seller; and (d) this Agreement is, and upon execution and delivery, the Seller's Documents will be a legal, valid, and binding agreement of Seller and, enforceable against Seller in accordance with their respective terms.

Section 4.3.    No Violation or Consents. Subject to the entry of the Sale Order, except as set forth on Schedule 4.3, neither the execution, delivery and performance of this Agreement by the Seller, nor the consummation of the transactions contemplated hereby will (a) violate or conflict with any provision of the certificate of formation or incorporation, as applicable, bylaws, operating agreement or other governing documents of Seller (b) require the consent, waiver, approval, license or authorization of or any filing by Seller with any third-party or public authority, (c) violate, conflict with or result in a breach of or the acceleration of any material obligation under, or constitute a default (or an event which with notice or the lapse of time or both would become a default) under, or give to others any right of termination, amendment, acceleration or cancellation of, or result in the creation of an Encumbrance on any Subject Assets, other than the Permitted Encumbrances, or (d) to Seller's knowledge, violate or conflict with any law, rule, regulation, permit, ordinance or regulation applicable to the Subject Assets to be transferred to Buyer or its nominee hereunder.

Section 4.4.    Compliance with Law. Except as set forth on Schedule 4.4:

(a)    Except as otherwise specifically directed by the Court, Seller has conducted and continues to conduct the Business in accordance with all Laws applicable to Seller and the Subject Assets.

(b)    All filings and notices relating to the Business, or the ownership or operation thereof, required to be made by Seller with all Governmental Authorities have been made by or on behalf of Seller other than filings or notices for which the failure to provide is not, individually or in the aggregate, reasonably expected to have a Material Adverse Effect on Seller.

Section 4.5.    Litigation. Except as set forth in Seller's Bankruptcy Filings, there is no dispute, challenge, action, suit, proceeding in equity or law, arbitration or administrative or other proceeding, any investigation by any person (including, without limitation, any Governmental Authority), any claim of infringement of any Trademark identified on Schedule 2.1(g), pending or threatened against or affecting Seller or the Subject Assets that, if adversely determined, would have a Material Adverse Effect upon the Subject Assets or Seller's ability to perform their obligations under this Agreement or upon the consummation of the transactions described herein. None of the Subject Assets are subject to any adverse order, judgment, injunction, writ or decree.

Section 4.6.    Financial Statements and Reports; Material Liabilities. Seller has provided Buyer with all financial statements and documents as requested and as required under the Sale

Order, Bid Procedures Order and the Bankruptcy Code (collectively, these documents are referred to as the "***Financial Statements***"). The Financial Statements are true and accurate and were prepared in accordance with sound accounting practices applied on a consistent basis with the past practices of Seller.

Section 4.7.    Absence of Certain Events. Except as ordered by the Court and disclosed in the filings, including Seller's Schedules of Assets and Liabilities and Statement of Financial Affairs, as amended from time to time, made by the Seller with the Court in connection with the Case (the "***Seller's Bankruptcy Filings***"), Seller has conducted its business in the ordinary course, and there has not been any:

(a)    Material Adverse Effect on the Subject Assets or in the financial condition, liabilities, Business or results of operations of Seller;

(b)    sale, assignment or transfer of any of the Material Assets of Seller;

(c)    any breach of, or default under, any Material Contract by Seller;

(d)    any communication, written or oral that any counterparty to a Material Contract has indicated that it intends to terminate its agreement with Seller or Buyer post-Closing or that it intends to materially reduce orders from Seller or Buyer post-Closing;

(e)    any environmental issues affecting any of the Subject Assets, including the Real Property other than as disclosed in the Environmental Assessment, as the term is defined below;

(f)    destruction or loss of any Subject Asset; or

(g)    increase in the compensation of officers or employees of Seller (including any such increase pursuant to any bonus, pension, profit sharing or other plan or commitment) or any increase in the compensation payable or to become payable to any such officer or employee or any severance or termination pay or any modification of any employee benefit plan to which any Seller is a party.

Section 4.8.    Material Contracts.

(a)    Copies of all contracts material to the Subject Assets in effect as of the Petition Date have been provided or made available by Seller to Buyer and are true and correct copies of all contracts or other agreements to which Seller is a party or is bound, or by which any of the Subject Assets are bound, whether or not made in the ordinary course of business, including those contracts and leases identified in Section 2.1 and as set forth on Schedule 4.8 (collectively, the "***Material Contracts***"). With respect to the Assigned Executory Contracts, on Schedule 4.8, Seller has indicated which Material Contracts may be classified as Executory Contracts.

(b)    Except as set forth on Schedule 4.8, subject to the orders of the Court and procedure prescribed in Section 7.3, (i) each Material Contract is a valid and binding agreement of Seller, enforceable in accordance with its terms; (ii) Seller has performed, and, to Seller's knowledge, each other party has performed or will perform, each material term, covenant and condition of each Material Contract required to be performed as of the date hereof and as of the Closing; and

(iii) to Seller's knowledge, no event has occurred that would, with the passage of time or compliance with any applicable notice requirements or both, constitute a default by Seller under any of the Material Contracts.

Section 4.9.    Employee Benefit Plans.

(a)    Set forth in Schedule 4.9 is a true and correct list of all of Seller's Employee Benefit Plans.

(b)    Each Employee Benefit Plan is and at all times has been maintained, funded, operated, administered and invested in compliance with the terms of such Employee Benefit Plan and all applicable Laws, including ERISA, and the Code and Seller has performed all of its material obligations under each Employee Benefit Plan. All contributions required to be made to any Employee Benefit Plan by applicable Laws or by the terms of such Employee Benefit Plan, and all premiums due or payable with respect to insurance policies funding any Employee Benefit Plan, for any period through the Closing Date, have been paid in full. None of the Subject Assets is encumbered by any indebtedness to any Employee Benefit Plan, the Pension Benefit Guaranty Corporation, the Internal Revenue Service, or any other individual or agency.

Section 4.10.    Intellectual Property.

(a)    Schedule 2.1(g) identifies (i) each patent, Trademark or Copyright which has been issued to Seller and has not expired with respect to any Intellectual Property (with any relevant registration numbers identified), (ii) each pending patent application and application for registration of a Trademark or Copyright which Seller has made with respect to any Intellectual Property, and (iii) each license, sublicense, agreement or other permission, relating to Intellectual Property to which any Seller is a party, pursuant to which any Seller has granted to any third-party the right to use any Intellectual Property.

(b)    Each item of Proprietary Property disclosed on Schedule 2.1(g) and all Internet web site content and software developed internally by Seller (i) is owned by Seller, free and clear of any Encumbrances, other than Permitted Encumbrances, and (ii) is not currently the subject of any challenge, opposition, litigation or any other proceeding before any Governmental Authority.

(c)    To the best of each Seller's knowledge, no Person is infringing upon the Intellectual Property owned or used by Seller, and Seller has not notified any Person that it believes that such Person is so infringing.

Section 4.11.    Environmental. Except as specifically disclosed to Buyer in the Limited Phase II Environmental Site Assessment dated July 2018 and attached hereto (the "***Environmental Assessment***") and to the best of Seller's knowledge at the time of entering into this Agreement:

(a)    no environmental issues or non compliance of environmental laws of any kind exist with respect to any real property owned or leased by the Seller, including the Real Property;

(b)    all permits have been obtained, are valid and in good standing;

(c)  all operations on or at the Real Property are and have been conducted in compliance with all applicable environmental laws;

(d)  Seller has not received any notification from any Governmental Authority seeking any information or alleging any violation of any applicable law;

(e)  Seller has not caused or permitted, and has no knowledge of, any release of any hazardous materials on-site or off-site of the Real Property;

(f)  the Real Property (and all uses thereof and operations conducted thereon) complies with all permits, and no hazardous materials are located on, in, or under the Real Property; and

(g)  no condition, circumstance, or set of facts directly or indirectly applicable to the Real Property constitutes or could reasonably be deemed to constitute a hazard to health, safety, property, or the environment for which Seller is or may be liable, or which is, or with the passage of time, could become an environmental claim or environmental noncompliance.

Section 4.12.  Real Property. To the best of Seller's knowledge at the time of entering into this Agreement:

(a)  All due, owing, and accrued (whether partially or fully) taxes on the Real Property have been paid prior to Closing or are being paid from the Purchase Price at Closing.

(b)  The Real Property is free and clear of all mechanic's liens, liens, mortgages, or encumbrances of any nature excepts as specifically identified and which shall be paid at closing from the proceeds of the Purchase Price.

(c)  There are no *lis pendens* filed against the Real Property in the applicable property records. Seller has full authority to sell the Real Property.

(d)  Seller has good and indefeasible fee simple title to the Real Property, free and clear of all conditions, exceptions, or reservations.

(e)  Seller has not granted any option or right of first refusal or first opportunity to any person or entity to acquire the Real Property or any interest therein.

(f)  Seller has not entered into any agreement or understanding, either written or oral, pursuant to which any person or entity has the right to own, acquire, use or occupy any portion of the Real Property or any interest therein.

(g)  Any improvements on the Real Property do not encroach on any easement or on any land not included within the boundary lines of the Real Property and there are no neighboring improvements encroaching on the Real Property.

(h)     The Real Property and its present use do not violate or conflict with any covenants, conditions or restrictions applicable to the Real Property.

(i)     There are no leases with any third-party tenants associated with or in existence which affect the Real Property.

(j)     There are no adverse parties in possession of the Real Property or of any part thereof and no parties in possession thereof except Seller.

(k)     There is no pending condemnation or similar proceeding affecting the Real Property and Seller has not received any written notice and has no knowledge that any such proceeding is contemplated.

Section 4.13.   <u>Seller as Debtor in Possession; No Trustee</u>. From the Petition Date through the Closing Date, Seller has been at all times in its Case debtor-in-possession pursuant to Section 1107 of the Bankruptcy Code, and no trustee or examiner has been appointed in the Case.

Section 4.14.   <u>Assigned Executory Contracts</u>. A true and accurate copy of each Executory Contract was made available to Buyer by Seller. All Executory Contracts are listed on Schedule 4.8, and every contract listed on Schedule 4.8 that is an Executory Contract is designated as an Executory Contract.

Section 4.15.   <u>Notice</u>. Seller has provided notice of its intent to enter into this Agreement to all creditors and other parties in interest.

## ARTICLE V.

## REPRESENTATIONS AND WARRANTIES OF BUYER

As a material inducement to Seller to enter into this Agreement and the Related Agreements and all other agreements and documents executed by Seller in connection with this Agreement and the Closing hereunder and to consummate the transactions contemplated by this Agreement and the Related Agreements, Buyer represents and warrants to Seller that:

Section 5.1.   <u>Organization and Good Standing</u>. Buyer is a limited liability company validly existing and in good standing under the Laws of the State of Texas. Buyer has full power and authority to carry on its business as and where now conducted and to own or lease and operate its properties at and where now owned or leased and operated by it, and is duly qualified to do business and is in good standing in every jurisdiction in which the property owned, leased or operated by it, or the nature of the business conducted by it, makes such qualification necessary.

Section 5.2.   <u>Authority</u>. Buyer has all requisite power and authority, corporate, trustee, partnership or otherwise, to execute, deliver, and perform under this Agreement and the other agreements, certificates, and instruments to be executed by it in connection with or pursuant to this Agreement (together with this Agreement, the "***Buyer Documents***"). The execution, delivery, and performance by Buyer of each Buyer Document to which it is a party has been duly authorized by all necessary action, corporate or otherwise, on the part of Buyer, as applicable. This Agreement has been, and at the Closing the other Buyer Documents will be, duly executed and delivered by

Buyer, as applicable, if such Party is party thereto. This Agreement is, and upon execution and delivery and Bankruptcy Court approval, each of the other Buyer Documents will be, a legal, valid, and binding agreement of Buyer, as applicable, enforceable against Buyer, as applicable, in accordance with their respective terms, except as enforceability may be limited by bankruptcy, insolvency or other laws affecting the enforcement of creditors' rights generally and general principles of equity.

Section 5.3.    <u>No Violation of Charter Documents, Contracts or Laws</u>. Neither the execution and delivery of this Agreement, nor the consummation of the transactions provided for herein or therein, will conflict with, or (with or without notice or lapse of time, or both) result in a termination, Breach, impairment or violation of: (a) any provision of Buyer's certificate of formation or incorporation, as applicable, bylaws, operating agreements or other charter documents, as applicable, as currently in effect; (b) any material contract to which Buyer is a party or bound; or (c) any federal, state, local or foreign judgment, writ, decree, order, statute, rule or regulation applicable to Buyer, which, in the case of clauses (b) and (c), would have or be reasonably expected to have a Material Adverse Effect on Buyer or their ability to consummate the transactions contemplated by this Agreement.

Section 5.4.    <u>Subject Assets "As Is"/Release</u>. Except as otherwise provided herein, Buyer shall acquire the Subject Assets on an "As Is, Where Is" basis, "With All Faults" as described Section 2.3 and Seller shall not be liable or bound in any manner by any oral or written statements or representations (other than those contained in this Agreement) relating to the Subject Assets. Buyer has entered into this Agreement on the basis of its own investigation of all the facts and conditions underlying or relating to the Subject Assets and the Business,

Section 5.5.    <u>Available Funds</u>. Buyer will have on the Closing Date sufficient funds available to it to perform all of their obligations under this Agreement, including, without limitation, to pay the Purchase Price in accordance with the terms of this Agreement and to assume the Assumed Liabilities.

**ARTICLE VI.**

**ADDITIONAL COVENANTS OF THE PARTIES**

Section 6.1.    <u>Due Diligence; Access to Information</u>. Buyer shall cooperate with Seller in permitting each to continue to conduct reasonable due diligence on Buyer, its operations, directors, principal shareholders, officers and employees.

Section 6.2.    <u>Mutual Cooperation</u>. The Parties agree to execute and deliver all other instruments and take all such other actions that either Party may reasonably request from time to time, before or after Closing and without payment of further consideration, to effectuate the transactions provided herein and to confer to the Parties hereto the benefits intended by such transactions. The Parties shall cooperate fully with each other and with their respective counsel and accountants in connection with any steps required to be taken as part of their respective obligations under this Agreement. Specifically, the Seller will assist with the transfer and assignment of any bank accounts to Buyer within five (5) days of Closing and will execute any documents required to assign the bank accounts.

Section 6.3.    <u>Seller's Employees</u>. Seller shall, on or before the Closing Date, terminate the employment of all of its employees and Seller shall remain solely liable and responsible for all obligations to their employees and former employees, including all salary, wages, bonuses, welfare and pension benefits, WARN Act Obligations and other compensation or benefits related to, in connection with or arising out of their employment with Seller or the termination of their employment by Seller in connection with the transactions contemplated by this Agreement or otherwise.

Section 6.4.    <u>Name Change</u>. On the Closing Date, Seller shall, and hereby agrees to, unconditionally, irrevocably and in perpetuity, relinquish to Buyer all rights to the use of the names "Navarro Pecan Company, Inc.," "Pecan Producers International, Inc.," and "Navarro", and all other Trademarks in the Subject Assets and any and all derivative forms thereof. Seller shall cause each of its subsidiaries, if any, with a corporate name which includes all or a portion of a Trademark included in the Subject Assets to, change its corporate name to a name which does not include all or a portion of any Trademark included in the Subject Assets and shall make all necessary legal filings with the appropriate authorities to reflect such changes. Buyer shall file a motion for the modification of the case caption on the proceedings before the Court to reflect the change of the names of Seller.

Section 6.5.    <u>Further Assurances</u>.

(a)    If any of the Parties becomes aware, prior to the Closing Date, that any of its representations, warranties or covenants is inaccurate or incapable of being performed in any material respect, then such Party shall promptly give written notice of such inaccuracy or incapability to the other Parties; provided, however, that nothing contained in this Section shall relieve the Party bound by such representation, warranty or covenant from complying with such representation, warranty or covenant.

(b)    The Parties shall each use reasonable efforts to cause the transactions contemplated herein and in the Related Agreements to be consummated in accordance with the terms hereof and thereof and, without limiting the generality of the foregoing, shall use reasonable efforts to obtain all necessary approvals, waivers, consents, permits, licenses, registrations and other authorizations required in connection with the Related Agreements, including, but not limited to, the Sale Order.

(c)    The Sale Order shall contain provisions authorizing the representative of the Seller to sign any documents which may be required after entry of the Sale Order and before and after the Closing Date to effectuate the transactions set forth herein. The reorganized Seller shall cause such representative to cooperate with Buyer in obtaining any necessary approvals, waivers, consents, permits, licenses, registrations or other authorizations in accordance with Section 6.7(b).

Section 6.6.    <u>Governmental Approvals</u>. In addition to as more specifically provided for in this Agreement, the Parties shall each use reasonable efforts and shall proceed diligently and in good faith to, as promptly as practicable, obtain all consents, approvals or actions of, make all filings with and give all notices to, Governmental Authorities required to consummate the transactions contemplated by this Agreement, if any. If consent by any Governmental Authority with respect to the assignment of a Material Contract is not granted Buyer, such withholding will

be a material default under this Agreement and Buyer will not be required to consummate the transaction proposed by this Agreement.

Section 6.7.    Publicity. No public announcement, press release or similar publicity with respect to this Agreement or the transactions contemplated by this Agreement shall be made by any Party prior to the Closing Date unless planned and coordinated jointly between the Parties, except to the extent otherwise required by applicable laws, rules or regulations governing the Parties, including the Bankruptcy Code, the Bankruptcy Rules, the federal securities laws and the rules and regulations of any applicable stock exchange.

Section 6.8.    Casualty. Seller will maintain until Closing all existing insurance, at its sole cost and expense. If any material portion of any Subject Asset shall be damaged or destroyed by fire or other casualty before the Closing, any Party may, at its option, and upon written notice prior to Closing to the other Parties, elect to exclude such, Subject Asset from this Agreement. If neither party elects to exclude such Subject Asset from this Agreement, Seller shall pay the deductible due under any insurance policy or policies insuring the same and deliver to Buyer, at Closing, any insurance proceeds actually received by Seller by reason of such casualty, and assign to Buyer all of its right, title and interest in any claim under any applicable insurance policies in respect of such casualty.

Section 6.9.    Conduct of Business.

(a)    Continuing Operations of Seller. From the date hereof and prior to the Closing Date, and except (i) as otherwise contemplated by this Agreement, (ii) in accordance with any order of the Court, or (iii) with the specific prior written consent of Buyer, Seller covenants and agrees with respect to the Business of the Seller that Seller shall conduct its business in the ordinary course, consistent with past practices, and shall operate in accordance with any existing orders of the Bankruptcy Court.

(b)    Continuing Operations of Buyer and Seller. Prior to the Closing Date, Buyer shall conduct its business (i) in the ordinary and usual course and (ii) in compliance with all applicable laws, rules and regulations.

## ARTICLE VII.

## BANKRUPTCY PROCEDURES, ETC.

Section 7.1.    Motion to Sell and Notice. Within five days of execution of this Agreement, Seller shall file a Motion to Sell, in a form agreeable to Buyer. Seller shall be responsible for giving notice under the Bankruptcy Code of all hearings thereon to all persons entitled to notice including those persons or entities who have asserted liens or encumbrances on the Subject Assets, all non-debtor parties to the Assigned Executory Contracts and any other notices that the Court should require so long as such filings are made with the consent of Buyer.

Section 7.2.    Defense of Orders. Seller shall use its reasonable best efforts to defend against any challenges in the event that Buyer elects, in its sole discretion, to close the purchase of the Subject Assets notwithstanding the pendency of any motion for reconsideration or appeal of such orders.

Section 7.3.    <u>Assumption and Rejection of Contracts and Leases and Cure Procedure</u>. The list of contracts to be assumed and assigned is included by designation of specific contracts on Schedule 4.8 <u>provided</u>, <u>however</u>, Buyer may amend the designation of contracts to be assumed and assigned at any time prior to the Closing Date. As a separate exhibit to the Sale Motion, Seller shall file with the Court a notice of the contracts to be assumed and assigned and a proposed cure amount. Notice of the Sale Motion will be provided to each counter-party to the contract. To the extent that contract is either added or removed from the list of Assigned Executory Contracts prior to the Closing Date but after filing of the Sale Motion, notice will be provided to each counterparty and each counterparty shall have fourteen (14) days to object to the proposed cure and assumption and assignment of the contract.

Seller shall use its best efforts to resolve any disputes concerning any cure amounts or other objections to assumption and assignment but requiring the approval of Buyer. Buyer is entitled to rely on the cure amounts established by the Court and will not incur any additional liability to the non-debtor parties for cure obligations. Buyer shall have demonstrated the ability to satisfy the conditions of Sections 365(b)(1)(C) of the Bankruptcy Code to the extent necessary to permit the assumption by Buyer and the assignment to Seller of the Assigned Executory Contracts.

Any executory contract or unexpired lease which has not expired by its own terms on or prior to the Closing Date, which has not been assumed, assumed and assigned, is the subject of a motion seeking to assume and assign the executory contract, the subject of a notice requesting the assumption and assignment of the contract, or rejected with the approval of the Court, or which the Seller has obtained the authority to reject but have not rejected as of the Closing Date, shall be deemed rejected on the Closing Date, and entry of the Sale Order by the Court shall constitute approval of such rejection pursuant to sections 365(e) and 1123(b)(2) of the Code.

## ARTICLE VIII.

## CONDITIONS PRECEDENT TO OBLIGATIONS OF BUYER

The obligations of Buyer under this Agreement are, at its option, subject to satisfaction or fulfillment of the following conditions at or prior to the Closing Date, any one or more of which may be expressly waived in writing by Buyer in its sole discretion:

Section 8.1.    <u>Representations and Warranties</u>. The representations and warranties made by Seller in this Agreement shall have been true and correct on the date hereof, and as of the Closing, with the same force and effect as though all such representations and warranties had been made as of the Closing.

Section 8.2.    <u>Performance of Covenants</u>. Each of the agreements, covenants and obligations, including each of the covenants under Articles IV and VI, that Seller is required to perform or to comply with pursuant to this Agreement at or prior to Closing shall have been duly performed and complied with. Seller shall have delivered each of the documents required to be delivered by Seller pursuant to this Agreement.

Section 8.3.    <u>No Injunctions</u>. There shall not be any pending or seriously threatened injunction or restraining order issued by a court of competent jurisdiction against the consummation of the sale and purchase of the Subject Assets pursuant to this Agreement.

Section 8.4.    <u>No Violation of Law</u>. There shall not be (i) any action taken, or any Law enacted, entered, enforced or deemed applicable to the transactions contemplated by this Agreement or the transactions contemplated by this Agreement by any Governmental Authority of competent jurisdiction, or (ii) any circumstance arising, or transaction, agreement, arrangement or instrument entered into, or which would be necessary to be entered into, in connection with the transactions contemplated by this Agreement or the transactions contemplated by this Agreement, which, in either case:

(a)    makes illegal or otherwise directly or indirectly restrains, enjoins or prohibits the transactions contemplated by this Agreement; or

(b)    results in a judgment or assessment of material damages directly or indirectly relating to the transactions contemplated herein.

Section 8.5.    <u>No Material Adverse Effect</u>. Since the date of this Agreement, no Material Adverse Effect shall have occurred with respect to the Subject Assets or the Business. For the avoidance of doubt, the mere filing of the Case shall not constitute a Material Adverse Effect.

Section 8.6.    <u>Assigned Executory Contracts</u>. The Court shall have entered an order in form and substance satisfactory to Buyer authorizing the assumption by Seller and the assignment to Buyer of the Assigned Executory Contracts; <u>provided</u>, <u>however</u>, that such order shall allow Buyer to amend the list of Assigned Executory Contracts as provided for in Section 7.3.

Section 8.7.    <u>Instruments of Transfer; Third-party Consents</u>. Buyer shall have received from Seller (i) the appropriate instruments of transfer required pursuant to Section 2.5 and Section 2.6, and (ii) any third-party consents required to transfer to Buyer all rights and benefits in and to the Subject Assets.

Section 8.8.    <u>Required Regulatory Approvals</u>. The Parties shall have received all Required Regulatory Approvals, necessary for the completion of the transactions contemplated by this Agreement and the continuation of the Business, by Buyer, post-Closing.

Section 8.9.    <u>Absence of Certain Changes</u>. Seller shall not be in breach of Section 4.7.

Section 8.10.    <u>Certificate of Non-Foreign Status</u>. Seller shall have delivered to Buyer a properly executed certificate, in the form prescribed by Treasury Regulations under Code Section 1445, stating that the Seller is not a "foreign person" within the meaning of Code Section 1445.

Section 8.11.    <u>No Defaults under Orders</u>. No default shall have occurred or be continuing under and pursuant to any order entered by the Bankruptcy Court.

Section 8.12.    <u>Sale Order</u>. Unless otherwise agreed to by the Parties, the Court shall have entered the Sale Order, which shall be in form and substance satisfactory to Buyer.

# ARTICLE IX.

## CONDITIONS PRECEDENT TO SELLER'S OBLIGATIONS

Seller's obligations hereunder are subject to the fulfillment or satisfaction, on and as of the Closing Date, of each of the following conditions (any one or more of which may be waived by Seller):

Section 9.1.    <u>Representations and Warranties</u>. The representations and warranties made by Buyer in this Agreement shall have been true and correct on the date hereof, and as of the Closing, with the same force and effect as though all such representations and warranties had been made as of the Closing Date.

Section 9.2.    <u>Performance of Covenants</u>. Each of the agreements, covenants and obligations, including each of the covenants under Article V, that Buyer is required to perform or to comply with pursuant to this Agreement at or prior to Closing shall have been duly performed and complied with. Buyer shall have delivered each of the documents required to be delivered by Buyer pursuant to this Agreement.

Section 9.3.    <u>No Injunctions</u>. There shall not be any pending or seriously threatened injunction or restraining order issued by a court of competent jurisdiction against the consummation of the sale and purchase of the Subject Assets pursuant to this Agreement.

Section 9.4.    <u>No Violation of Law</u>. There shall not be (i) any action taken, or any Law enacted, entered, enforced or deemed applicable to the transactions contemplated by this Agreement or the transactions contemplated by this Agreement by any Governmental Authority of competent jurisdiction, or (ii) any circumstance arising, or transaction, agreement, arrangement or instrument entered into, or which would be necessary to be entered into, in connection with the transactions contemplated by this Agreement or the transactions contemplated by this Agreement, which, in either case:

(a)    makes illegal or otherwise directly or indirectly restrains, enjoins or prohibits the transactions contemplated by this Agreement; or

(b)    results in a judgment or assessment of material damages directly or indirectly relating to the transactions contemplated herein.

Section 9.5.    <u>Cure Procedure, Procedure for Designation of Assigned Executory Contracts and Satisfaction of Cure Obligations</u>. Buyer shall have demonstrated the ability to satisfy the conditions of Sections 365(b)(1)(C) only of the Bankruptcy Code to the extent necessary to permit the assumption by Buyer and the assignment by Seller of the Assigned Executory Contracts in accordance with Section 7.3.

Section 9.6.    <u>Sale Order</u>. The Court shall have entered the Sale Order.

Section 9.7.    <u>No Material Adverse Effect</u>. Since the Execution Date, no Material Adverse Effect shall have occurred with respect to Buyer.

## ARTICLE X.

## CLOSING

**Section 10.1.**   Closing. The consummation of the transactions contemplated by this Agreement (the "***Closing***" or "***Close***") shall take place at the offices of Bonds Ellis Eppich Schafer Jones LLP, Fort Worth, TX, or at such other place as the Parties may agree, commencing at 10:00 a.m. local time on [Date] or such other date as Buyer and Seller may mutually determine but in no event later than [Date] (the "***Closing Date***"). The Parties shall use their commercially reasonable efforts to obtain the satisfaction or waiver of all conditions to the obligations of the Parties to consummate the transactions contemplated hereby within fifteen (15) days after the Court has entered the Sale Order approving such sale to Buyer, unless this provision is waived by Buyer. Section 3.1 shall survive Closing.

## ARTICLE XI.

## TERMINATION; SURVIVAL AND LIMITATIONS OF REPRESENTATIONS AND WARRANTIES

Section 11.1.   Termination. This Agreement may be terminated, and the transactions contemplated hereby may be abandoned, by written notice promptly given to the other Party hereto, at any time prior to the Closing Date:

(a)   by mutual written consent of the Parties;

(b)   by either Party by written notice to the other Party if any permanent injunction or other order of a court of competent authority or government agency that prevents the consummation of the transaction shall have become final and non-appealable;

(c)   immediately, by Seller, if Buyer is in breach of its obligations under Section 3.1: it being expressly understood and acknowledged by Buyer that time is of the essence with respect to their obligations in the afore-referenced sections,

(d)   by Seller if (i) any of the conditions specified in Article IX have not been met or waived by Seller on or before the Closing Date or (ii) Buyer or Seller commits a breach of any of the covenants or agreements (other than those specified in Section 11.1(c)) contained herein, which breach cannot be or has not been cured within ten (10) days after Seller has given written notice to Buyer of such breach, provided that such breach would be reasonably likely, individually or in the aggregate with other breaches, to materially impair the ability of Buyer to perform its obligations under this Agreement in any material respect or otherwise materially threaten or materially impede the consummation of the transactions described in this Agreement;

(e)   by Buyer if (i) any of the conditions specified in Article VIII have not been met or waived by Buyer on or before the Closing Date; or (ii) Seller commits a breach of any of the covenants or agreements contained herein, which breach cannot be or has not been cured within ten (10) days after Buyer has given written notice to Seller of such breach, provided that such breach would be reasonably likely, individually or in the aggregate with other breaches, to materially impair the ability of Seller to perform their obligations under this Agreement in any

material respect or otherwise materially threaten or materially impede the consummation of the transactions described in this Agreement; or

(f)        by any Party if the Closing has not occurred by the latest of (i) [Date] (or such later date as the Parties may agree to) or (ii) the date that is fifteen (15) days after the entry of the Sale Order.

Section 11.2.    Effect of Termination.

(a)        Upon any termination of this Agreement pursuant to this Article XI, this Agreement shall become wholly void and of no further force or effect and there shall be no liability on the part of any of the Parties or their respective shareholders, officers or directors or any Seller Related Party; provided, however, such termination shall not affect the liability of any Party for the intentional breach of any provision of this Agreement; and further provided, however, that the provisions of Section 11.2, Section 11.3, Section 11.4, Section 11.5, Section 13.1 Sections 16.7 - 16.8 and Sections 16.10 - 16.13 shall remain in full force and effect.

(b)        If Seller terminates this Agreement pursuant to Section 11.1(c), Buyer shall, as liquidated damages and as Buyer's exclusive remedy, pay Seller $[***]. Except as provided in this Section 11.2(b), Buyer shall have no further obligation to Seller.

(c)        If a Party terminates this Agreement pursuant to Section 11.1(a), Section 11.1(b), Section 11.1(d), Section 11.1(e), or Section 11.1(f) the Parties shall have no further obligation to each other.

Section 11.3.    Termination of Representations and Warranties. The representations and warranties of the Parties in this Agreement or in any exhibit, appendix or schedule attached hereto shall terminate at the Closing.

Section 11.4.    Termination of Covenants. The covenants and agreements of the Parties hereto contained in this Agreement or in any exhibit, appendix or schedule attached hereto, to the extent that, by their terms, they are to be performed prior to or on the Closing Date, shall terminate on the Closing Date or, to the extent they are to be performed after the Closing, shall terminate sixty (60) days following the expiration of all applicable statutes of limitations applicable to any claim with respect to such covenant or agreement.

Section 11.5.    Limitations of Representations and Warranties. Buyer understands that neither Seller nor any Seller Related Party are making any representation or warranty relating to Seller or any of their assets, liabilities or operations or the transactions contemplated hereby whatsoever, express or implied, except that Seller is making those representations and warranties explicitly set forth in this Agreement. Buyer represents and acknowledges that it has entered into this Agreement on the basis of its own examination, personal knowledge, and opinion of the value of the Subject Assets net of the Assumed Liabilities. Except as specifically set forth in the representations and warranties in this Agreement, Buyer is not relying on the accuracy or completeness of any information regarding Seller or any of its assets, liabilities or operations or the transactions contemplated hereby, and Buyer further agrees that no Seller Affiliate shall have or be subject to any liability to Buyer or any other person or entity resulting from the distribution to Buyer, or their respective use, of any such information. Buyer further acknowledges that Seller

has made no agreement or promise to repair or improve any of the Subject Assets being sold to Buyer, and that Buyer takes all of the Subject Assets in the condition existing on the Closing Date "AS IS, WHERE IS" basis "WITH ALL FAULTS" and that except as expressly set forth in this Agreement, Seller makes no representations or warranties, terms, conditions, understandings or collateral agreements of any nature or kind, express or implied, by statute or otherwise, concerning the Subject Assets or the condition, quality, or usefulness of the Subject Assets, including without limitation any implied warranty of merchantability or fitness for a particular purpose, which warranties are also hereby expressly disclaimed. NO PARTY SHALL BE LIABLE UNDER THIS AGREEMENT FOR ANY LOST PROFITS OR INDIRECT, CONSEQUENTIAL, PUNITIVE, OR SPECIAL DAMAGES UNDER ANY CIRCUMSTANCES.

## ARTICLE XII.

## OTHER AGREEMENTS

Section 12.1.    <u>Other Agreements</u>. Seller will hold as constructive trustee for the benefit of Buyer and will promptly (and in no event less than seventy-two (72) hours) turn over to Buyer all Cash and Cash Equivalents, including those received by wire transfer, relating to the collection of Accounts Receivable after the Closing Date. Seller hereby grants Buyer an irrevocable power of attorney to endorse such checks, drafts and other matters and any check, draft or other matter arising after the Closing relating to Buyer's business issued in the name of Seller.

## ARTICLE XIII.

## EXPENSES

Section 13.1.    <u>Expenses</u>. Except as otherwise provided herein, Buyer and Seller will bear their own respective expenses, including attorneys' and accountants' fees, in connection with the preparation and negotiation of the transactions contemplated by this Agreement and the Related Agreements. The provisions of this Article XIII shall not apply with respect to any expenses incurred by the Parties in connection with any action for a breach of this Agreement or any Related Agreement.

## ARTICLE XIV.

## NOTICES

Section 14.1.    <u>Notices</u>. All notices, requests, demands and other communications under this Agreement must be in writing and will be deemed duly given, unless otherwise expressly indicated to the contrary in this Agreement, (i) when personally delivered, (ii) upon receipt of a telephonic facsimile transmission with a confirmed telephonic transmission answer back, (iii) three (3) days after having been deposited in the United States mail, certified or registered, return receipt requested, postage prepaid, or (iv) one (1) Business Day after having been dispatched by a nationally recognized overnight courier service, addressed to the Parties or their permitted assigns at the following addresses (or at such other address or number as is given in writing by either Party to the other) as follows:

{00010125:2}                                            -26-

| To Seller: | Navarro Pecan Company, Inc. |
| | ATTN: |
| | 4200 South Hulen Street, Suite 680 |
| | Fort Worth, Texas 76109 |
| | Facsimile: |
| | Email: |

| With copies, which shall not constitute notice, to: | Bonds Ellis Eppich Schafer Jones LLP |
| | 420 Throckmorton Street, Ste. 1000 |
| | Fort Worth, Texas 76102 |
| | Facsimile: (817) 405-6905 |
| | Joshua@BondsEllis.com |
| | Attn: Joshua Eppich |

| To Buyer: | RJS Holdings, LLC |
| | Attn: RJ Sikes |
| | 1101 Little School Road |
| | Arlington, Texas 76017 |
| | Phone: (254) 717-5110 |
| | Email: rj@gcpdq.com |

| With copies, which shall not constitute notice, to: | Hansen & Associates |
| | Attn: Jeff Hansen |
| | 1101 Little School Road |
| | Arlington, Texas 76017 |
| | Phone: (817) 429-0956 |
| | Email: Jeff@hansenattorneys.com |

Lundberg Law
Attn: Gregg Lundberg
501 N. 8th Street
Midlothian, Texas 76065
Phone: (972) 775-3500
Email: glundberg@gdllawyer.com

Either Party may change its address for the purposes of this Article by giving the other Party written notice of the new address in the manner set forth above.

## ARTICLE XV.

## REMEDIES NOT EXCLUSIVE

Except as otherwise provided in Section 11.2(b), no remedy conferred by any of the specific provisions of this Agreement is intended to be exclusive of any other remedy, and each

and every remedy will be cumulative and will be in addition to every remedy given under this Agreement or now or subsequently existing, at Law or in equity, by statute or otherwise.

## ARTICLE XVI.

## MISCELLANEOUS

Section 16.1.    <u>Counterparts</u>. This Agreement may be executed in two (2) or more counterparts, each of which will be deemed to be an original but all of which together will constitute one and the same document. Facsimile transmission or e-mail transmission in portable document format of the executed version of this Agreement or any counterpart thereof shall have the same force and effect as the original.

Section 16.2.    <u>Captions and Section Headings</u>. Captions and section headings are for convenience and reference only, are not a part of this Agreement and shall not be deemed to affect the meaning or interpretation of any section or paragraph hereof.

Section 16.3.    <u>Singular and Plural</u>. Unless the context of this Agreement otherwise clearly requires, references to the plural include the singular and the singular includes the plural.

Section 16.4.    <u>Passage of Title and Risk of Loss</u>. Legal title, equitable title and risk of loss with respect to the Subject Assets will not pass to Buyer until such assets are transferred to Buyer at the Closing.

Section 16.5.    <u>Waivers</u>. The Party for whose benefit a warranty, representation, covenant or condition is intended may in writing expressly waive any inaccuracies in the warranties and representations contained in this Agreement or expressly waive compliance with any of the covenants or conditions contained herein and so expressly waive performance of any of the obligations of the other Party hereto, and any defaults hereunder; provided, however, that such waiver must be in writing, and shall not affect or impair the waiving Party's rights with respect to any other warranty, representation or covenant or any default hereunder, nor shall any waiver constitute a continuing waiver.

Section 16.6.    <u>Parties in Interest</u>. Nothing in this Agreement, whether express or implied, is intended to confer any rights or remedies under or by reason of this Agreement on any persons other than the Parties to it and their respective successors and permitted assigns, nor is anything in this Agreement intended to relieve or discharge the obligations or liabilities of any third person or give any third person any right of subrogation or action over or against any Party to this Agreement.

Section 16.7.    <u>Benefit and Burden; Assignment</u>. This Agreement is binding upon and shall inure to the benefit of the Parties and their successors and permitted assigns; <u>provided</u>, <u>however</u>, that this Agreement is not assignable, directly or indirectly, or any part thereof, by (i) Buyer without the prior written consent of Seller (which consent shall not unreasonably be withheld, conditioned or delayed); or (ii) Seller without the prior written consent of Buyer (which consent shall not unreasonably be withheld, conditioned or delayed); provided, that Buyer may assign its rights and liabilities hereunder to one or more Affiliates of Buyer, which assignment shall not relieve Buyer of its obligations hereunder. Buyer hereby acknowledges that the assignment of this Agreement by Buyer may require the approval of the Court.

Section 16.8.    Amendments, Supplements or Modifications. The Parties may amend or modify this Agreement in a writing duly executed in the same manner as this Agreement by duly authorized representatives of the Parties, provided that any such amendment shall be subject to the approval of the Court.

Section 16.9.    Entire Agreement. This Agreement, together with the schedules, exhibits appendices and the agreements, certificates and instruments delivered pursuant hereto, contain the entire agreement among the Parties hereto, and supersede all prior agreements and undertakings (written and oral) between the Parties, relating to the subject matter hereof.

Section 16.10.    Governing Laws. This Agreement shall be governed by and construed in accordance with the Bankruptcy Code, applicable Bankruptcy Rules and the internal, substantive laws of the State of Texas without regard to any state's choice or conflicts of laws provisions.

Section 16.11.    Venue and Jurisdiction.

(a)    THE COURT WILL HAVE JURISDICTION OVER ANY AND ALL DISPUTES BETWEEN OR AMONG THE PARTIES, WHETHER IN LAW OR EQUITY, ARISING OUT OF OR RELATING TO THIS AGREEMENT OR ANY RELATED AGREEMENT; PROVIDED, HOWEVER, THAT IF THE COURT IS UNWILLING OR UNABLE TO HEAR ANY SUCH DISPUTE, THE COURTS OF THE STATE OF TEXAS LOCATED IN TARRANT COUNTY, AND THE FEDERAL COURTS OF THE UNITED STATES OF AMERICA LOCATED IN THE NORTHERN DISTRICT OF THE STATE OF TEXAS WILL HAVE SOLE JURISDICTION OVER ANY AND ALL DISPUTES BETWEEN OR AMONG THE PARTIES, WHETHER IN LAW OR EQUITY, ARISING OUT OF OR RELATING TO THIS AGREEMENT OR ANY AGREEMENT CONTEMPLATED HEREBY.

(b)    EACH OF THE PARTIES HERETO HEREBY IRREVOCABLY WAIVES, TO THE FULLEST EXTENT PERMITTED BY APPLICABLE LAW, ANY AND ALL RIGHT TO TRIAL BY JURY IN ANY LEGAL PROCEEDING ARISING OUT OF OR RELATED TO THIS AGREEMENT OR THE TRANSACTIONS CONTEMPLATED HEREBY.

Section 16.12.    Construction. The Parties have participated jointly in the negotiation and drafting of this Agreement, and, in the event of an ambiguity or a question of intent or a need for interpretation arises, this Agreement shall be construed as if drafted jointly by the Parties, and no presumption or burden of proof shall arise favoring or disfavoring any Party by virtue of the authorship of any of the provisions of this Agreement.

Section 16.13.    Validity of Provisions. Should any part of this Agreement for any reason be declared by any court of competent jurisdiction to be invalid, such decision shall not affect the validity of the remaining portions of this Agreement, which remaining portions shall continue in full force and effect as if this Agreement had been executed with the invalid portion thereof eliminated there from, it being the intent of the Parties that they would have executed the remaining portions of this Agreement without including any such part or portion which may for any reason be declared invalid.

Section 16.14.    Access to Records and Records Retention. Seller and Buyer shall (i) each provide the other with such assistance as may reasonably be requested by any of them in

connection with the preparation of any Tax Return, audit or other examination by any taxing authority, or judicial or administrative Proceeding related to liability for Taxes; (ii) each retain and provide the other with any records or other information that may be relevant to such Tax Return, audit or examination, Proceeding, or determination; and (iii) each provide the other with any final determination of any such audit or examination, Proceeding, or determination that affects any amount required to be shown on any Tax Return of the other for any period. Without limiting the generality of the foregoing, Buyer and Seller each shall retain, until the applicable statutes of limitations (including any extensions thereof) have expired, copies of all Tax Returns, supporting work schedules and other records or information that may be relevant to such returns for all tax periods or portions thereof ending before or including the Closing Date and shall not destroy or otherwise dispose of any such records without first providing the other Party with a reasonable opportunity to review and copy the same. (i) Buyer hereby acknowledges that Seller shall be entitled to make copies in electronic or paper form of all records relating to tax filings, production, shipping, inventory and depreciation as well as Seller's general ledger and (ii) such copies shall be retained by Seller following the Closing hereunder and may be moved to a location of Seller's choosing, all subject to reasonableness and reasonable notice.

Section 16.15.  <u>Notice to Customers</u>. Seller agrees to cooperate in communicating the transfer of the Subject Assets to Buyer to its former and current customers via electronic mail communication (where available) and as otherwise may reasonably requested by Buyer after the Sale Order and before the Closing Date; <u>provided</u>, such communication is in accordance with all Laws and requirements of any relevant Governmental Authority.

[Signatures follow on the next page.]

IN WITNESS WHEREOF, the Parties have duly executed this Asset Purchase Agreement as of the date first set forth above.

**SELLER:**                                    **BUYER:**

**Navarro Pecan Company, Inc.**                **RJS Holdings, LLC**

By:_____            By:_____

Name: _____            Name: _____

Its:_____            Its:_____

**List of Exhibits and Schedules**

Exhibit A – Bill of Sale and Assignment
Exhibit B – Intellectual Property Assignment Agreement
Exhibit C – General Warranty Deed
Exhibit D – Purchase Price Calculation

Schedule 2.1(b) – Fixed Assets
Schedule 2.1(c) – Personal Property
Schedule 2.1(e) – Licenses and Permits
Schedule 2.1(g) – Intellectual Property
Schedule 2.1(j) – Prepaid Assets
Schedule 2.1(l) – Real Property
Schedule 4.1(b) – Seller Business Jurisdictions
Schedule 4.1(c) – Seller's Corporate Organizational Chart
Schedule 4.3 – Seller's Consents
Schedule 4.4 – Compliance with Law
Schedule 4.8 – Material Contracts
Schedule 4.9 – Seller's Employee Benefit Plans