Joshua N. Eppich
Texas Bar I.D. No. 24050567
J. Robertson Clarke
Texas Bar I.D. No. 24108098
C. Joshua Osborne
Texas Bar I.D. No. 24065856
Bryan C. Assink
Texas Bar I.D. No. 24089009
BONDS ELLIS EPPICH SCHAFER JONES LLP
420 Throckmorton Street, Suite 1000
Fort Worth, Texas 76102
(817) 405-6900 telephone
(817) 405-6902 facsimile
Email: joshua@bondsellis.com
Email: robbie.clarke@bondsellis.com
Email: c.joshosborne@bondsellis.com
Email: bryan.assink@bondsellis.com

**PROPOSED COUNSEL FOR**
**DEBTOR AND DEBTOR-IN-POSSESSION**

### IN THE UNITED STATES BANKRUPTCY COURT
### FOR THE NORTHERN DISTRICT OF TEXAS
### FORT WORTH DIVISION

| | | |
|---|---|---|
| IN RE: | § | CHAPTER 11 |
| | § | |
| NAVARRO PECAN COMPANY, INC., | § | CASE NO. 23-40266-elm11 |
| | § | |
| Debtor.[1] | § | |
| | § | |

### DECLARATION OF BRAD WALKER IN SUPPORT OF
### DEBTOR'S CHAPTER 11 PETITION AND FIRST DAY MOTIONS

I, Brad Walker, hereby submit this declaration (the "**Declaration**") pursuant to 28 U.S.C.

§ 1746, under penalty of perjury:

1.      My name is Brad Walker. I am over the age of twenty-one and am competent to

make this Declaration.[2]

2.      I am the Chief Restructuring Officer of Navarro Pecan Company, Inc. (the

---

[1] The Debtor's principal address is 4200 South Hulen Street, Suite 680, Fort Worth, Texas 76109. The Debtor's facilities are located at 2131 East Highway 31, Corsicana, Texas 75109.

[2] Capitalized terms used herein and not otherwise defined shall have the meanings given them in their corresponding motion and those definitions shall be incorporated herein.

"**Debtor**" or the "**Company**"), in the above-captioned chapter 11 case (the "**Chapter 11 Case**").

In such capacity, I am familiar with the Debtor's day-to-day operations and financial affairs.

      3.     I submit this Declaration in support of the Debtor's voluntary petition for relief

under chapter 11 of the Bankruptcy Code and the relief requested in the following motions filed

by the Debtor in connection with its bankruptcy petition (collectively, the "**First Day Motions**"):

    a)  *Emergency Motion for Entry of Interim and Final Orders (I) Authorizing Debtor to Obtain Post-Petition Financing, (II) Granting Liens on Debtor's Assets, and (III) Scheduling a Final Hearing Pursuant to Bankruptcy Rule 4001(c)*;

    b)  *Emergency Motion for Interim and Final Orders (I) Authorizing Maintenance of Existing Bank Accounts and Cash Management System; (II) Authorizing Continued Use of Existing Business Forms and Records; (III) Waiving the Requirements of 11 U.S.C. § 345(b); and (IV) Related Relief*;

    c)  *Emergency Motion for Entry of an Order (I) Authorizing the Debtor to (A) Pay Prepetition Wages, Salaries, Other Compensation, and Reimbursable Expenses and (B) Continue Employee Benefit Programs and (II) Granting Related Relief*;

    d)  *Emergency Motion for Entry of Interim and Final Orders (I) Approving the Debtor's Proposed Adequate Assurance Payments for Future Utility Services; (II) Prohibiting Utility Companies From Altering, Refusing, or Discontinuing Services; and (III) Approving the Debtor's Proposed Procedures for Resolving Adequate Assurance Requests*;

    e)  *Emergency Motion for Order Extending Time to File Schedules of Assets and Liabilities, Statement of Financial Affairs, and Other Documents*; and

    f)  *Motion for Emergency Consideration of First Day Motions*.

      4.     Except as otherwise indicated, all facts set forth in this Declaration are based upon

my personal knowledge, my personal interaction with fellow members of the Debtor's

management and other of the Debtor's advisors, my review of relevant documents, business

records, and my experience and knowledge of the Debtor's operations and financial condition. I

am authorized to submit this Declaration on behalf of the Debtor, and, if called upon to testify, I

could and would testify competently to the facts set forth herein.

# I.    BACKGROUND

**A.    History of Navarro Pecan Company, Inc.**

5.    The Debtor was founded in 1977 in Corsicana, Texas as a pecan shelling, marketing, packaging, and distribution operation by three co-founders: (i) George Martin, a nut and pecan industry veteran; (ii) Collin Street Bakery, a local fruitcake producer and consumer of pecans; and (iii) Jasper B. Sanfilippo, a part of a family nut company now known as John B. Sanfilippo & Son, Inc. Since its founding, the Debtor has grown and currently operates from a 211,000 square foot facility in Corsicana, Texas. The Debtor has approximately 170 employees, the majority of which are "leased" employees contracted through a staffing company. The Debtor is now one of the largest pecan shelling operations in the country, processing and selling millions of pounds of pecans annually to both domestic and international customers. The Debtor's customer base consists of large, well-known consumer and commercial brands that have historically provided the Debtor with reliable operations and cash flow year to year.

6.    The Debtor has operated for over four decades in this commodity-based industry through strong, long-term relationships with three key constituencies. First, the Debtor has close ties with domestic pecan growers who provide the Debtor with in-shell pecans. Second, the Debtor works with brokers to both buy the raw product for processing and to sell the finished product post-processing. Third, the Debtor maintains a variety of well-known industrial customers across different segments of the food industry, including bakery, dessert, and snack companies. These relationships and the stability offered by reliable purchase and sales contracts have historically allowed Navarro to successfully operate despite operating in a commodity-based industry susceptible to swings in prices. The majority of the Debtor's sales arise from these long-term contract sales, but the Debtor also engages in "spot market" sales whereby the Debtor will sell

pecan products to customers with an immediate need for the purchase of pecan products. The Debtor is primarily a wholesale provider of pecan products, although there is a retail storefront at its plant. The Debtor's customer base is principally domestic, but the Debtor has maintained an international customer base for years.

7.      The Debtor provides a range of different services to its customers relating to the sale of pecans. These services include the sizing, grading, shelling, sorting and distribution of raw in-shell and shelled pecan products. This is due to the fact that the pecan cracking process will include pecan halves and pieces of varying sizes and grades that must be sorted and graded prior to sale. As part of these services, the Debtor has been a certified SQF (Safe Quality Food) Level 3 designation (the highest level available) since 2013 to ensure the quality and safety of its food products. In addition, the Debtor has the processing capabilities for value-added services such as roasting and flavoring of pecans. The Debtor also maintains a large cold storage facility adjacent to its shelling operations that permit the Debtor to store pecans for longer periods of time.

8.      George Martin, one of the founders of the Debtor, successfully led the Debtor until his passing in January 2021. The Debtor is currently being managed by Mr. Martin's daughter, Mary Martin Magers, as CEO of the Debtor.

**B.      Debtor Ownership**

9.      The current ownership of the Debtor is as follows: (i) Estate of George Martin, (49%); (ii) Collin Street Bakery (49%); and (iii) Estate of Jasper B. Sanfilippo (2%).

10.     Collin Street Bakery was founded in 1896 and is a Corsicana-based manufacturer and global seller of fruitcake and dessert products, and is a present customer of the Debtor.

11.     Jasper B. Sanfilippo was a member of a large publicly-traded nut company based in Chicago, Illinois that has significant domestic shelling plant operations.

C.      **Principal Assets of the Debtor**

12.     The Debtor operates from a 211,00 square foot facility located in Corsicana, Texas. The Debtor owns a subsidiary known as Pecan Producers International, Inc. which operates a small retail storefront at the Debtor's plant facility. In addition, the Debtor also leases warehouse space in Corsicana, Texas from an entity known as 3M Processing, LLC which is then leased to a separate entity known as Pure and Natural Food Consortium LLC for the pasteurization of Navarro's pecan products. Both of these other entities are partially owned by insiders of the Debtor, but are not directly connected to the Debtor. Finally, the Debtor leases warehouse space in Mansfield, Louisiana from one of its pecan suppliers for the storage of pecan products.

13.     The Debtor owns significant equipment and other personal property at its Corsicana facility relating to its shelling, sorting, roasting, flavoring, and packaging operations.

14.     Finally, the Debtor owns approximately 2.9 million pounds of shelled pecan products that are presently in cold storage at the Corsicana facility as well as a small amount of recently shelled pecans. There are also in-shell pecans located at the Corsicana facility but, generally speaking, such product is held on consignment for the suppliers until the Debtor transports specific loads of the in-shell pecans through the facility for processing.

D.      **Financial Background**

15.     The Debtor has two secured lenders, Truist Bank ("**Truist**") and Hillcrest Bank ("**Hillcrest**"). Based on my understanding of the relevant loan and security documents, the collateral of Truist and Hillcrest are completely separate and do not overlap, and in addition there are no cross-collateralization provisions applicable to either. The Debtor also has unsecured notes owing to two of its primary suppliers of in-shell pecans and a large outstanding balance to the Debtor's third primary supplier of in-shell pecans. Finally, the Debtor has unsecured notes owing

to three insiders. Additional details of these financial obligations are set forth below. The remainder of the Debtor's financial obligations consist of ordinary course debt to vendors from the Debtor's day-to-day operations.

16.    Truist serves as the Debtor's asset-based secured lender pursuant to a credit facility, providing the Debtor with operating capital to fund ordinary course expenditures such as inventory, labor costs, and other operational costs. The credit facility is provided pursuant to that certain Revolving Credit Agreement dated as of May 31, 2019 (as amended or modified, the "**Credit Agreement**"). The Debtor's obligations under the Credit Agreement are secured principally by the Debtor's accounts and inventory, although Truist also holds a security interest in a single piece of equipment. The balance of the Debtor's obligation to Truist under the Credit Agreement as of January 21, 2023 was approximately $12 million, although the precise amount of the balance fluctuates daily based on the Debtor's collections to, and expenditures from, the credit facility. Additional detail regarding the Debtor's day-to-day financial activities as they relate to the Truist credit facility are set forth elsewhere in this Declaration.

17.    Hillcrest serves as the Debtor's secured lender with respect to real property assets and equipment. The loan from Hillcrest is provided pursuant to that certain Loan Agreement dated as of May 29, 2019 (as amended or modified, the "**Loan Agreement**"). The Debtor's obligations under the Loan Agreement are secured principally by the Debtor's real property assets and equipment (except for that certain recently acquired piece of equipment that is the collateral of Truist). The balance of the Debtor's obligation to Hillcrest under the Loan Agreement as of January 21, 2023 was approximately $5.3 million.

18.    As of the Petition Date, the Debtor owes approximately $5.19 million and $3.17 million to, respectively, Easterlin Pecan Company and Pecan Producers, Inc., two of the Debtor's

principal suppliers of in-shell pecans. These obligations are pursuant to unsecured notes issued by the Debtor for outstanding debt for in-shell pecans previously provided by these two suppliers. In addition, the Debtor owes a third supplier, U.S. Pecans, Ltd., approximately $3.77 million on an unsecured basis for in-shell pecans previously provided by this supplier.

19.    Finally, the Debtor currently owes approximately $8.5 million on account of unsecured notes to three insiders, including the Estate of George Martin, Collin Street Bakery, and Mary Martin Magers.

**E.    Events Leading to Bankruptcy**

20.    The Debtor initiated this Chapter 11 Case to address a severe cash flow tightening that has almost eliminated the Debtor's ability to operate its business. From 2018 through 2021, market prices for pecans consistently dropped, affecting the company's profit margins and credit availability with Truist. Pecan prices rebounded in 2022, and the outlook for 2023 remains strong. The Debtor has been increasingly unable to operate efficiently, however, due to financial constraints from its asset-based lender. The change in management precipitated by the unfortunate passing of the Debtor's co-founder and long-time leader also resulted in Truist declaring a default under its loan documents. Finally, the Debtor's operations in the face of these difficulties resulted in the build-up of significant shelled pecan inventory that had to be stored in its on-site cold storage facilities.

21.    The combination of these factors has caused the Debtor to gradually become unable to pay its debts as they become due. In recent weeks, the Debtor's ability to process inventory to meet customer orders and to pay necessary labor and operating costs has been curtailed to the point that the Debtor is on the verge of completely shutting down its processing plant. In order to preserve the viability of the Debtor, the jobs of over 190 workers, and the going concern value of

the Debtor and its assets for the benefit of all interested parties, the Debtor is in dire need of additional capital.

22.     Prior to the Petition Date, the Debtor ran a two-year marketing process for additional capital. At the demand of Truist, the Debtor engaged Triton Capital Partners, Ltd. ("**Triton**") in January 2021 to assist with financial advisory work and subsequently engaged Triton to assist with capital placement in June 2021. Triton ran a marketing process for a significant capital placement in 2021 and 2022, working closely with both the Debtor's management and Truist. Ultimately the Debtor was unable to locate new capital through Triton's services, either in the form of a replacement lender or new equity investor.

23.     As of September 15, 2021, the Debtor engaged Stone Tower Advisors, Inc. to serve as Chief Restructuring Officer and appointed me as Chief Restructuring Advisor. Since that time, the Debtor has appointed me as Chief Restructuring Officer.

24.     In its ongoing effort to locate new financing, the Debtor engaged Galena Capital Partners Inc. ("**Galena**") on July 1, 2022. Galena focused on both strategic and investor categories of potential financing.

25.     Prior to filing this Chapter 11 Case, the Debtor received a proposal from RJS Holdings, LLC (the "**Buyer**") involving a bidding, auction, and sale process in conjunction with debtor-in-possession financing. The Buyer is not an insider of the Debtor and is infusing new capital into the Debtor's operations through this Chapter 11 Case. Due to the severe financial distress that the Debtor was facing, the Debtor elected to file this Chapter 11 Case to pursue the proposal from the Buyer.

## II.      FIRST DAY RELIEF

26.      On January 30, 2023, the Debtor sought voluntary relief under chapter 11 of the United States Bankruptcy Code and has continued to operate its business and manage its properties.

27.      The Debtor filed the First Day Motions seeking to maintain and stabilize the Debtor's business operations and minimize the adverse effects of the commencement of this bankruptcy case, as well as expedite a swift and smooth restructuring of the Debtor's business and balance sheet. In connection with preparation for these bankruptcy proceedings, I reviewed each of the First Day Motions and I believe that the allegations contained in each are true and correct to the best of my knowledge, information, and belief. The requested relief is critical to the Debtor's ability to continue in operation, and therefore, necessary to avoid immediate and irreparable harm and maximize the return to their estates and creditors. The facts in support of the First Day Motions are detailed below.

### A.      DIP Financing Motion

28.      The Debtor has an immediate need to use the proceeds of the DIP Loan. The Debtor has limited access to cash to fund its day-to-day operations during this Chapter 11 case and the DIP Loan will allow the Debtor to continue operating and pay bankruptcy administrative costs. The Debtor does not have consent from Truist to use cash collateral and is not seeking at this time authorization to use any of Truist's cash collateral. However, the Debtor does assert that Truist's cash collateral ought to be used to maintain and protect Truist's other, non-cash collateral and reserves the right to seek such relief.

29.    Without the immediate access to the proceeds of the DIP Loan, the Debtor will suffer immediate and irreparable harm. The Debtor lacks sufficient liquidity to ensure that it can successfully continue its day-to-day operations.

30.    Authorizing the DIP Loan is vital to this Chapter 11 case's success.  The DIP Loan will provide an infusion of cash to fund this Chapter 11 case and will allow the Debtor to efficiently manage paying any expenses associated with its day-to-day operations and its professionals.

31.    The DIP Loan is the only viable means for Debtor, as there are no other lenders willing to fund the Debtor on the same terms and conditions as the DIP Lender. The Debtor is otherwise unable to obtain unsecured financing which would meet the Debtor's liquidity needs for this case. Without the requested relief, the Debtor will be unable to preserve the going-concern value of its assets and the estate will suffer irreparable injury. The DIP Loan will provide the Debtor with immediate and ongoing access to funds needed to avoid harm to Debtor's estate and potential erosion of the enterprise value of Debtor's business, and is in the best interests of Debtor's estate.

**B.**    **Cash Management Motion**

32.    Prior to the Petition Date, in the ordinary course of its business, the Debtor managed the financial aspects of its business through, as defined below, a Cash Management System, the Account, and related processes. These account systems and practices are discussed more fully below.

*i.*    *Cash Management System*

33.    In connection with the operation of its business, the Debtor manages its cash, accounts receivable, and payables through a centralized cash management system (the "**Cash Management System**") to efficiently collect, transfer, and disburse funds generated by its

business operations. The Cash Management System allows the Debtor to control and monitor funds and available cash, as well as keep current and accurate accounting records of all daily cash transactions.

34.     The Cash Management System allows the Debtors to receive wires and ACH transfers into its collection bank account (the "**Collections Account**") at Truist Bank ("**Truist**"). Truist sweeps the Collections Account on a daily basis to apply the funds to the Debtor's credit facility with Truist. The Debtor also uses an account at Community National Bank & Trust located in Corsicana, Texas (the "**Community National Collections Account**") to deposit cash and checks received from customers for products. The Debtor transfers funds from the Community National Collections Account to the Collections Account on a daily basis.

35.     The Cash Management System also allows the Debtors to issue payments as necessary for its operations. The Debtor has an operating account (the "**Operating Account**") at Truist from which the Debtor makes the majority of its payments via ACH transfer, including payroll and many of the Debtor's vendors. Truist funds the Operating Account on a payment-by-payment basis. The Debtor also maintains an accounts payable account (the "**AP Account**") from which the Debtor issues checks for certain vendors. The AP Account will automatically draw funds from the Operating Account.

### ii.     *Account Management*

36.     The Debtor maintains accounting controls with respect to each of its bank accounts and can accurately trace the funds through its Cash Management System to ensure that all transactions are adequately documented and readily ascertainable. The Debtor will maintain its books and records relating to the Cash Management System to the same extent such books and records were maintained prior to the Petition Date. Accordingly, the Debtor will be able to

accurately document, record, and track the transactions occurring within the Cash Management

System for the benefit of their bankruptcy estate and for all parties in interest.

### *iii.*    *Bank Accounts*

37.    In connection with its Cash Management System, the Debtor maintains a total of

eight bank accounts (collectively, the "**Accounts**"):

- <u>Collections Account</u>: Account ending in -0688 located at Truist Bank
- <u>Community National Collections Account</u>: Account ending in -5010 located at Community National Bank & Trust
- <u>Operating Account</u>: Account ending in -0662 located at Truist Bank
- <u>AP Account</u>: Account ending in -0704 located at Truist Bank
- <u>Employee Benefits Account</u>: Account ending in -0720 located at Truist Bank
- <u>Payroll Account</u>: Account ending in -0712 located at Truist Bank (dormant)
- <u>Employee Account</u>: Account ending in -0696 located at Truist Bank (dormant)
- <u>Community National Employee Account</u>: Account ending in -5479 located at Community National Bank & Trust (dormant)

38.    Truist is listed as an authorized depository in the United States Trustee's

Authorized Depository Listing (rev. January 24, 2023). The Debtor has directed each of the above-

referenced banks to, as of the Petition Date, refrain from making any payments on account of any

pre-petition obligations owed by the Debtor without the Debtor's prior approval, which approval

will only be granted with respect to payments authorized by an order of this Court. Similarly, all

automatic payments have been cancelled to avoid payment of pre-petition obligations, and the

Debtor has instructed these banks to not honor any pre-petition checks that had not cleared as of

the Petition Date.[3]

### *iv.*    *The Debtor's Existing Business Forms*

39.    In the ordinary course of business, the Debtor uses distinct correspondence and

business forms, including, without limitation, letterhead, purchase orders, and invoices

---

[3] To the extent that the Debtor subsequently determines that a check issued pre-petition but not yet cleared as of the Petition Date should be honored, the Debtor may seek Court authority and reserves the right to do so.

(collectively, the "**Business Forms**"). To minimize the expense to the Debtor's estate associated with developing or purchasing entirely new forms, the delay in conducting business prior to obtaining such forms, and the confusion of employees, customers, suppliers and vendors, the Debtor seeks authority to continue to use all such Business Forms as they existed immediately prior to the Petition Date.

**C.      Employee Wages Motion**

   ***i.      Overview of the Debtor's Workforce***

40.     As of the Petition Date, the Debtor directly employs approximately 190 employees (the "**Employees**") in connection with its pecan shelling operations in Corsicana, Texas. The Employees are comprised of approximately 50 individuals on a full-time, salary basis (the "**Direct Employees**") and approximately 140 leased employees on a full-time, hourly wage basis (the "**Leased Employees**") through a staffing company 5th Avenue Temporaries (the "**Staffing Company**"). As of the Petition Date, the Debtor is not utilizing any independent contractors or part-time employees.

41.     The Employees perform a wide variety of functions that are critical to the Debtor's operations, the administration of this Chapter 11 case, and successful reorganization.  The Employees' skills, knowledge, and understanding of the Debtor's operations and infrastructure are essential.  Without the continued, uninterrupted services of the Workforce, the Debtor's operations and restructuring efforts will suffer immediate and irreparable harm.

42.     The Employees heavily rely on their compensation and benefits from the Debtor to pay their daily living expenses and support their families. The Employees will be exposed to significant financial constraints if the Debtor cannot continue paying the Employees'

compensation and providing benefits in the ordinary course. The relief requested herein is customary, necessary, and appropriate.

### ii.    *Overview of the Debtor's Compensation and Benefit Programs*

43.    To avoid substantial harm and minimize the Employees' personal hardship if the Debtor's employee obligations are not paid when due or as expected, the Debtor seeks authority to pay and honor certain prepetition claims relating to compensation and benefit programs.[4] Specifically, the Debtor seeks authority to pay and honor certain prepetition claims relating to wages, salaries, expense reimbursements, other compensation, federal and state tax withholdings, other amounts withheld (including Employees' share of insurance premiums, taxes, health savings accounts and flexible spending accounts contributions, and 401(k) contributions), health insurance and other types of insurance, disability coverage, retirement benefits, workers' compensation benefits, paid time off, and other benefits that the Debtor has historically directly or indirectly provided to the Employees in the ordinary course of business (together, the "**Compensation and Benefit Programs**," and such obligations arising therefrom, the "**Compensation and Benefit Obligations**") as well as all incidental costs thereof.

44.    Subject to the Court's approval, the Debtor intends to continue its prepetition Compensation and Benefit Programs in the ordinary course of business and consistent with past practice. Out of an abundance of caution, however, the Debtor requests the right to modify, change, and discontinue any of its Compensation and Benefit Programs and to implement new programs, policies, and benefits—in the Debtor's discretion and in the ordinary course of business—during this Chapter 11 case and without the need for further Court approval, subject to applicable law.

---

[4] The Debtor uses Paychex as a third-party payroll processor (the "**Payroll Processor**").

### a.    *Direct Employee Salaries*

45.    In the ordinary course of business, the Debtor incurs and pays the Direct Employees' salaries and other compensation on a weekly basis (the "**Direct Employee Compensation**"). The Debtor seeks authority to continue using the Payroll Processor with respect to the Direct Employees and paying any prepetition and postpetition costs related thereto in the ordinary course. The Debtor pays its Direct Employees' salary obligations (the "**Salaries**") in the approximate amount of $36,000 per every week. Employees are paid on each Friday for the preceding week. The Debtor's most recent pay cycle occurred on January 27, 2023, where employees were paid for the week of January 15-21 in the gross amount of $36,832.21.

46.    Because some Direct Employees are paid in arrears, certain Direct Employees will be owed accrued but unpaid Salaries as of the Petition Date.  There may also be potential discrepancies between the amounts paid and the amounts that Direct Employees believe should have been paid, which may reveal that additional amounts are owed to such Direct Employees. Additionally, the Debtor compensates certain Direct Employees for overtime services, which may have occurred and may not be recorded in the system.  Payments for such overtime services may be due and owing as of the Petition Date, but the approximate amount due and owing is unknown to the Debtor given the overtime reporting system utilized by the Debtor.

47.    As of the Petition Date, the Debtor estimates that the gross accrued but unpaid Salaries is approximately $36,800 (the "**Unpaid Salaries**"), which will become due and owing within twenty-one days of the Petition Date.  The Debtor seeks authority to pay the Unpaid Salaries in the ordinary course of business and consistent with past practices and continue paying the Salaries and any associated processing costs on a postpetition basis in the ordinary course of business.

48.     The Debtor does not believe there are prepetition unpaid amounts owed to any Direct Employee on account of the Unpaid Salaries that exceed $15,150, the priority expense amount set forth in section 507(a)(4) of the Bankruptcy Code, and the Debtor is not seeking authority to pay Unpaid Salaries to any Direct Employee in excess of such amount.

### b.    Leased Workers Obligations

49.     In the ordinary course of business, the Debtor uses the Staffing Company, 5th Avenue Temporaries, for all wages, disbursements, and withholdings (collectively, the "**Leased Employee Obligations**") related to the Leased Workers. For clarity, the Debtor incurs the Leased Employee Obligation and remits that amount to the Staffing Company who then remits the funds, subject to any withholds, to the appropriate Leased Employee. The Debtor seeks authority to continue using the Staffing Company with respect to the Leased Employees and paying any prepetition and postpetition costs related thereto in the ordinary course. The Debtor pays the Staffing Company approximately $65,000 per week for gross payroll on account of Leased Employee Obligations. The Debtor's most recent payment to the Staffing Company occurred on January 27, 2023.

50.     As of the Petition Date, the Debtor owes the Staffing Company approximately $70,740 for services rendered by the Leased Employees for the Debtor (the "**Unpaid Leased Employee Obligations**"), not including monthly workers' compensation liabilities, which will become due and owing within the first twenty-one days of this Chapter 11 case. The Debtor seeks authority to pay the Unpaid Leased Employee Obligations in the ordinary course of business and consistent with past practices and continue paying such obligations on a postpetition basis in the ordinary course of business.

51.     The Debtor does not believe there are prepetition unpaid amounts owed with respect to any Leased Employee on account of the Unpaid Leased Employee Obligations that exceed $15,150, the priority expense amount set forth in section 507(a)(4) of the Bankruptcy Code, and the Debtor is not seeking authority to pay Unpaid Leased Employee Obligations to any Leased Employee in excess of such amount.

### c.     Deductions

52.     During each applicable pay period, the Debtor, through the Payroll Processor, routinely deducts and withholds certain amounts from Direct Employees' paychecks for, among other things, pre- or post-tax deductions payable pursuant to certain of the benefit programs (together, the "**Deductions**").   The Deductions are generally processed and forwarded to the appropriate third party at the same time the Direct Employees' payroll checks are disbursed.

53.     The Debtor seeks authority to pay and/or remit the Unpaid Deductions in the ordinary course of business and consistent with past practice and continue paying and/or remitting the Deductions and any associated processing costs on a postpetition basis in the ordinary course of business.

### d.     Taxes

54.     The Debtor is also required by U.S. law to old from Direct Employee Compensation amounts related to federal, state, and local income taxes, as well as Social Security and Medicare taxes (together, the "**Direct Employee Payroll Taxes**") for remittance to the appropriate federal, state, and local taxing authorities.  The Debtor must then match the Direct Employee Payroll Taxes from its own funds and pay—based upon a percentage of gross payroll—additional amounts for state and federal unemployment insurance (together with the Direct Employee Payroll Taxes, the

"**Payroll Taxes**").  The Payroll Taxes are generally processed and forwarded to the appropriate

taxing authority at the same time the Direct Employees' payroll checks are disbursed.

55.      The Debtor seeks authority to pay and/or remit the Unpaid Payroll Taxes in the

ordinary course of business and consistent with past practice and continue paying and/or remitting

the Payroll Taxes and any associated processing costs on a postpetition basis in the ordinary course

of business.

*e.*      ***Expense Reimbursements***

56.      In the ordinary course of business, the Debtor reimburses the Employees for

reasonable and customary expenses that such Employees incur in the scope of their employment.

Expense reimbursements consist of business-related expenses incurred in the course of an

Employee's duties (the "**Expense Reimbursements**"). Generally, an Employee personally incurs

an eligible expense, and the Debtor reimburses that expense.

57.      Employees may be held personally liable for any unpaid expense even though they

incurred the expense for the Debtor's benefit. The Debtor's inability to reimburse its Employees

with respect to any Expense Reimbursements would significantly burden those Employees.

58.      Because of the irregular nature of requests for Expense Reimbursements, the

Debtor faces difficulties in determining the amount of unpaid Expense Reimbursements at any

given time. Historically, however, the Expense Reimbursements are approximately $1,500 per

month.  As of the Petition Date, based on historical practice, the Debtor estimates that the amount

of accrued but unpaid Expense Reimbursements is less than $1,500 (the "**Unpaid Expense**

**Reimbursements**"), which will become due within the first twenty-one days of this Chapter 11

case. The Debtor seeks authority to pay the Unpaid Expense Reimbursements in the ordinary

course of business and consistent with past practice and continue paying the Expense Reimbursements on a postpetition basis in the ordinary course of business.

### f.      *Employee Benefit Programs*

59.     The Debtor offers its Direct Employees a wide range of perks and benefits that are integral to the Debtor's successful operation, which the Motion explores below. The Debtor provides its employees with certain employee benefits, including, without limitation, medical, dental, vision, life and disability insurance, personal time-off, 401(k) savings plans, severance benefits, and other similar programs and miscellaneous benefits (collectively, "**Employee Benefits**"). These benefits are an integral part of each full-time employee's total compensation package. Interruption of these additional benefits would seriously disrupt the morale of the employees and would undermine the Debtor's efforts to preserve the value of the estate. Thus, the Debtor requests authority to pay certain prepetition amounts attributable to Employee Benefits from time to time as and when such amounts become due in the ordinary course of business.

### g.      *Health Insurance Programs*

60.     The Debtor offers its Direct Employees the opportunity to participate in certain health and other benefit plans as set forth below (together, and including any administrative costs, the "**Health Insurance Programs**").

### I.      *The Medical Plans*

61.     The Debtor offers fully-insured medical coverage (the "**Medical Plans**") to its Direct Employees through Aetna. Direct Employees are provided with certain plan options that each have various required premiums. The Medical Plans provide coverage for, among other things, outpatient and inpatient services, preventative care, and prescription drug services. Direct Employees and their spouses, children, and/or eligible dependents may be covered under the

Medical Plans, and the Debtor covers all of the Direct Employee's premiums for the Medical Plans and half with respect to spouses, children, and/or eligible dependents. After taking applicable Deductions, the Debtor pays approximately $28,000 per month for the Medical Plans premiums. The Debtor estimates that it owes Aetna approximately $34,031.89 for the Medical Plans as of the Petition Date.

## II.   *Health Reimbursement Account and Flexible Spending Account*

62.    As part of the Debtor's Health Insurance costs, the Debtor maintains a Health Reimbursement Account ("**HRA**") that allows Direct Employees who participate in the high deductible health plan to receive reimbursement of a portion of the deductible spent during each year in an amount of up to $4,000 of the $5,000 deductible.

63.    The Debtor also provides Direct Employees with access to an optional healthcare flexible spending account (the "**FSA**"), administered by Pattillo, Brown & Hill LLP.  Participating Direct Employees can make contributions to the FSAs to cover certain qualified expenses.  The total monthly fees to the administrator of these accounts are $302. The Debtor estimates this fee will be due and owing on the Petition Date.

## III.   *Dental and Vision Plans*

64.    The Debtor offers dental and vision coverage (the "**Dental and Vision Plans**") to its Direct Employees through Metlife.  Direct Employees and their spouses, children, and/or eligible dependents may be covered under the Dental and Vision Plans.  The participating employees are responsible for paying the cost of the Dental and Vision Plans, which are deducted from their paychecks.  The Debtor, in turns, pay Metlife the cost of the Dental and Vision Plans. The total monthly amount paid by the Debtor to Metlife for the Dental and Vision Plans is

approximately $1,705.90. The Debtor believes that no amounts are owed to Metlife for these plans as of the Petition Date.

*IV.     COBRA Policy*

65.     The Debtor provides its Direct Employees coverage under the Consolidated Omnibus Budget Reconciliation Act ("**COBRA**"), which gives Direct Employees certain rights to continue their benefits (the "**COBRA Policy**"). The COBRA Policy is administered by Ameriflex. The monthly fee for the administration is this policy is $65, which the Debtor believes is owing as of the Petition Date.

***h.     Additional Benefits***

66.     In addition to the Health Insurance Programs, the Debtor offers its Direct Employees the opportunity to participate in the following additional benefits.

*I.     Life Insurance, AD&D Insurance, and LTD Insurance*

67.     The Debtor offers life and accidental death and dismemberment insurance coverage (the "**Base Life and AD&D Insurance**") to its Direct Employees through Metlife. In addition, the Debtor offers Long Term Disability insurance ("**LTD Insurance**") for its management personnel. The cost of these policies is fully born by the Debtor.

68.     The Debtor seeks authority to pay the Unpaid Base Life, AD&D Insurance, and LTD Insurance obligations in the ordinary course of business and consistent with past practice and continue paying these obligations on a postpetition basis in the ordinary course of business. The total monthly cost of these obligations is approximately $1,317.76. The Debtor believes no amounts are due to Metlife for these obligations as of the Petition Date.

## II.   *Disability Benefit and Supplemental Insurance*

69.     The Debtor provides Direct Employees with fully-insured short- and long-term disability benefits and other supplemental insurance (the "**Supplemental Benefits**") through Aflac.  The Debtor seeks authority to pay the unpaid Supplemental Benefits in the ordinary course of business and consistent with past practice and continue paying these obligations on a postpetition basis in the ordinary course of business. The Supplemental Benefits are fully paid by employees through deductions. The Debtor remits the total amount of approximately $3,317.10 per month to Aflac on account of these obligations. The Debtor estimates that this amount is due and owing to Aflac as of the Petition Date.

## III.   *Workers' Compensation Program*

70.     The Debtor maintains workers' compensation insurance (the "**Workers' Compensation Program**") for applicable Direct and Leased Employees at the level required by law and satisfies the Debtor's obligations arising under or related to the Workers' Compensation Program (the "**Workers' Compensation Obligations**").

71.     The Debtor must continue the claim assessment, determination, adjudication, and payment process pursuant to the Workers' Compensation Program without regard to whether such liabilities are outstanding before the Petition Date to ensure that the Debtor complies with applicable laws and requirements during this Chapter 11 case.

72.     The Debtor pays Workers' Compensation Obligations monthly. For Direct Employees, the total cost is approximately $1,900 per month. For Leased Employees, the total cost is approximately $12,500 per month. The Debtor estimates that the total amount of $14,400 is due and owing as of the Petition Date on account of the Workers' Compensation Obligations for the month of January. Out of an abundance of caution, the Debtor seeks authority to continue paying

the Workers' Compensation Obligations on a postpetition basis and in the ordinary course of business.

73.    To the extent any an applicable employee asserts new claims arising under the Workers' Compensation Program, the Debtor requests that the Court modify the automatic stay under section 362 of the Bankruptcy Code to permit the employee to proceed with their claims under the Workers' Compensation Program. This required modification of the automatic stay pertains to claims solely under the Workers' Compensation Program.

IV.    *Leave Benefits*

74.    The Debtor maintains the following paid leave benefit programs for Direct Employees (the "**Leave Benefits**").

75.    In the ordinary course of business, the Debtor provides paid time off ("**PTO**") to eligible Direct Employees. PTO accrues at a specified rate based on the Direct Employee's time in the industry or years of relevant work experience. A Direct Employee accrues PTO each month and may carry over limited amounts of unused PTO. Direct Employees may not cash out unused PTO.

76.    In the ordinary course of business, the Debtor provides certain other paid and unpaid leave, including holidays, bereavement, jury duty, voting leave, military leave, leave provided for under the Family Medical Leave Act, and all legally required leaves (together, the "**Other Leave**"). Direct Employees are not entitled to any cash payments related to the Other Leave.

77.    Continuation of the Leave Benefits in the ordinary course of business and consistent with past practice is essential to maintaining Direct Employee morale during this Chapter 11 case. Further, the policies are broad-based programs that all Direct Employees have come to depend.

As a result, the Debtor seeks authority to continue offering and honoring the Leave Benefits on a postpetition basis and in the ordinary course of business.

V.      401(k) Plan

78.      The Debtor provides all eligible Direct Employees with the ability to participate in a defined contribution 401(k) profit sharing plan (the "**401(k) Plan**"), which is administered by Southeastern Employee Benefit Services ("**SEBS**").  The Debtor incurs various administrative fees for the 401(k) Plan (the "**401(k) Administrative Fees**"), including a monthly fee of approximately $150 for administering the 401(k) Plan.

79.      Direct Employees are generally eligible to participate in a 401(k) Plan immediately upon employment.  The 401(k) Plan generally provides for pre-tax deductions of compensation up to limits set by the Internal Revenue Code, as well as for certain post-tax deductions. Direct Employee contributions to the 401(k) Plan are deducted automatically from each paycheck and transferred to a trust established under the 401(k) Plan (together, the "**401(k) Deductions**," and together with the 401(k) Administrative Fees, the "**401(k) Obligations**").

80.      As of the Petition Date, the Debtor estimates that the amount of accrued but unpaid obligations due on account of the 401(k) Plan is approximately $3,343 (the "**Unpaid 401(k) Obligations**"), consisting of approximately $3,193 unremitted weekly 401(k) Deductions and approximately $150 unpaid 401(k) Administrative Fees. A portion of the Unpaid 401k Obligations will become due and owing within the first twenty-one days of this Chapter 11 case.  The Debtor seeks authority to remit and/or pay the Unpaid 401(k) Obligations in the ordinary course of business, consistent with past practices, and continue remitting and/or paying the 401(k) Obligations on a postpetition basis in the ordinary course of business.

D.      **Utilities Motion**

81.     Certain companies (the "**Utility Companies**") provide the Debtor with utility services (the "**Utility Services**"), such as electricity, water, trash, telecommunications, and other services that are necessary to continue the Debtor's day-to-day affairs. A non-exclusive list of the Utility Companies that provide Utility Services to the Debtor as of the Petition Date is attached as Exhibit C to the relevant motion (the "**Utility Services List**"). The Debtor has made a good-faith effort to identify all Utility Companies and list them on the Utility Services List.

82.     Uninterrupted Utility Services are critical to the Debtor's ability to operate and maintain the value of its business and maximize value for the benefit of all stakeholders. The Debtor could not operate its business without the Utility Services. Should any Utility Company refuse or discontinue service, the Debtor would be forced to limit or significantly curtail operations. Such a disruption would substantially impair the Debtor's business and result in revenue loss, which could irreparably harm and jeopardize the Debtor's operations and objectives. Continuing the Utility Services uninterrupted during this Chapter 11 case is essential.

83.     To the best of the Debtor's knowledge, there are no defaults or arrearages with respect to the Debtor's undisputed invoices for prepetition Utility Services. On average, the Debtor pays approximately $60,000 each month for Utility Services (the "**Estimated Monthly Utility Cost**").

84.     The Debtor intends to timely pay postpetition obligations owed to the Utility Companies. The Debtor expects that cash generated from its operations and the Debtor's post-petition cash availability will provide sufficient liquidity to pay obligations related to Utility Services in accordance with prepetition practices.

85.     To provide additional assurance of payment to the Utility Companies, the Debtor

proposes to deposit approximately $20,000 (the "**Adequate Assurance Deposit**") into a

segregated account (the "**Adequate Assurance Account**"). The Adequate Assurance Deposit will

be held in the Adequate Assurance Account for the duration of this Chapter 11 case and may be

applied to any postpetition defaults in payment to the Utility Companies.

**E.     Emergency Motion for Order Extending Time to File Schedules of Assets and
         Liabilities, Statement of Financial Affairs, and Other Documents**

86.     Good cause exists for the Court to grant the Debtor an extension of time in which

to file its Schedules and Statements.

87.     The analysis and compilation of the information for the Schedules and Statements

will require additional time because: (i) there are other urgent demands upon the Debtor as a result

of the filing of the Chapter 11 Case that will consume the time of the Debtor's limited personnel;

(ii) many of the Debtor's liabilities may constitute contingent, unliquidated claims relating to

obligations that are difficult to quantify; and (iii) the Debtor and its professionals need time to

evaluate the information comprising the Schedules and Statements.

88.     I believe that an extension will provide the Debtor with sufficient time in which to

prepare and file the Schedules and Statements.

**F.     Request for Emergency Consideration**

89.     Due to the nature of the relief sought in the First Day Motions, emergency

consideration is essential. The relief requested in the First Day Motions is necessary and

appropriate on an accelerated basis, including on an interim basis with respect to certain of the

First Day Motions. If such relief is not considered and granted on such an accelerated basis, the

Debtor risks substantial disruption to its ongoing operations, which could result in immediate and

irreparable harm to the Debtor, its bankruptcy estate, and creditors. The need for an emergency

hearing was not caused by lack of due diligence, act, or failure to act by the Debtor or its proposed counsel, but by the circumstances of the Chapter 11 Case.

### III.    CONCLUSION

90.    For the reasons stated herein and in each of the First Day Motions filed concurrently with the commencement of the Debtor's Case, I respectfully request that each of the First Day Motions be granted in its entirety, together with such other and further relief as this Court deems just and proper.

Pursuant to 28 U.S.C. § 1746, I declare under penalty of perjury that the Declaration, is to the best of my information and belief, true and correct.

Fort Worth, Texas, this 30th day of January, 2023.

*/s/ Brad Walker*
Brad Walker
Chief Restructuring Officer
Navarro Pecan Company, Inc.